### 5.      Filed Claims and the Claims Objections Process

Subsequent to the passage of the Bar Date, the Debtor confirmed that the filed

Claims asserted against the Debtor exceeds the total amount of projected Allowed Priority and

Unsecured Claims scheduled by the Debtor, because, among other things, certain Claims:

(i) consist of amendments to previously filed Claims; (ii) assert amounts in excess of the

amounts actually owed or are disputed; (iii) do not allege an obligation of the Debtor; (iv) assert

contingent Claims; (v) were filed in duplicate; and/or (vi) include postpetition interest and other

disallowable charges. Subsequent to the passage of the Bar Date, the Debtor filed the *Debtor's*

*First Omnibus Objection to Claims – Duplicate Claims [Docket No. 527]* (the "Omnibus Claim

Objection"), pursuant to which the Debtor objected to the allowance of 106 duplicate claims that

had been filed against it. In addition, the Debtor also filed the *Debtor's Objection to Purported*

*Class Claim No. 778, Filed by Plaintiffs Marisol Smith, Tina Matthes, and Their Attorney*

*[Docket No. 592]* (the "Class Claim Objection"). Pursuant to the Class Claim Objection, the

Debtor opposes the allowance of a purported class proof of claim.

In addition to the Omnibus Claim Objection and Class Claim Objection noted

above, the Debtor and/or the Liquidating Debtor under the Plan may object or seek to estimate

other Claims. The Debtor anticipates that such objections will be filed to those Proofs of Claims

that are: (A) duplicative; (B) superseded by amended Claims; (C) not obligations of the Debtor;

(D) untimely; or (E) in excess of the amount actually owed, as evidenced by the Debtor's books

and records or other relevant information or analyses.

The Debtor presently anticipates that the Claims asserted against it will ultimately

be resolved in and reduced to an amount that approximates the amounts estimated in the

Disclosure Statement. However, the actual aggregate amount of Allowed Claims in any Class

may ultimately differ significantly from the Debtor's estimate thereof. Any variance from such

estimate will affect projected distributions.

### 6.    Creditors' Committee Investigation Into Liens and Claims of Debtor's Pre-Petition Secured Lenders

In accordance with the Order entered by the Bankruptcy Court authorizing the

Debtor to obtain debtor-in-possession financing, the Debtor stipulated and agreed to the validity

and priority of the liens and claims of its pre-petition lenders under a Financing Agreement dated

as of March 12, 2004 (the "Financing Agreement") among the Debtor, The CIT Group/Business

Credit, Inc. ("CIT Business Credit"), as the "Tranche A" Lender, and Madeleine L.L.C.

("Madeleine"), as the "Tranche B" Lender. (CIT Business Credit and Madeleine shall,

collectively, be referred to as the "Pre-Petition Lenders"). The Debtor's acknowledgement of the

validity and priority of the Pre-Petition Lenders' liens and claims was made subject to the right

of the Committee to review such liens and claims and, if appropriate, commence an adversary

proceeding in the Bankruptcy Court to challenge, in whole or in part, the validity, extent and/or

priority of Pre-Petition Lenders' liens and claims.

The Committee's general counsel, Otterbourg, Steindler, Houston & Rosen, P.C.

("OSH&R"), undertook to review and advise the Committee regarding the liens and claims of

Madeleine. The Committee, due to a potential conflict of OSH&R, retained the law firm of

Jaspan, Schlesinger, Hoffman LLP ("JSH"), as its special counsel to investigate the liens and

claims of CIT Business Credit. In connection with the reviews undertaken by OSH&R and JSH,

both firms reviewed numerous documents including Loan and Security Agreements,

correspondence, financial information, Minutes of the Board of Directors and various inter-creditor documents. Additionally, OSH&R and JSH interviewed numerous business and professional representatives of the Debtor regarding with the documents reviewed by each firm, as well as with respect to the circumstances and events relevant to the financial deterioration of the Debtor's operations and the events which precipitated the commencement of this Chapter 11 case.

The provisions of the debtor-in-possession financing order contained a deadline for the Committee to complete its review of the Pre-Petition Lenders' claims and liens. OSH&R and JSH each advised the Committee of the results of their investigations regarding whether claims existed against Madeleine and/or CIT Business Credit. Based upon the investigation undertaken by OSH&R with respect to Madeleine, and JSH with respect to CIT Business Credit, the Committee determined that there was no legally sufficient basis to successfully assert claims against the Pre-Petition Lenders. Accordingly, the deadline to challenge the validity and extent of the liens and claims of the Pre-Petition Lenders was allowed to lapse without the commencement of an adversary proceeding against Madeleine or CIT Business Credit.

### 7.    Extension of Exclusivity

Section 1121 of the Bankruptcy Code grants a debtor in possession the exclusive right to file a plan of reorganization for 120 days after the filing of a voluntary petition for relief under chapter 11(the "Exclusive Filing Period") and the exclusive right to solicit acceptances to that filed plan for 180 days after the petition's filing (the "Exclusive Solicitation Period"), subject to a further extension for cause. On April 24, 2006, the Debtor filed that certain *Motion for an Order pursuant to 11 U.S.C. § 1121(d) Extending the Time Periods during which the*

*Debtor has the Exclusive Right to File a Plan and Solicit Acceptances Thereto [Docket No. 444]*
(the "First Exclusivity Motion"). Pursuant to the First Exclusivity Motion, the Debtor sought to

extend (i) the Exclusive Filing Period from May 24, 2006 through August 22, 2006, and (ii) the

Exclusive Solicitation Period from July 23, 2006 through October 23, 2006. The Court entered

an order granting the First Exclusivity Motion on May 16, 2006. On July 19, 2006, the Debtor

filed that certain *Motion for an Order Pursuant to 11 U.S.C. § 1121(D) Further Extending the*

*Time Periods During Which the Debtor has the Exclusive Right to File a Plan and Solicit*

*Acceptances Thereto* (the "Second Exclusivity Motion"). Pursuant to the Second Exclusivity

Motion, the Debtor sought to extend (i) the Exclusive Filing Period from August 22, 2006

through October 6, 2006, and (ii) the Exclusive Solicitation Period from October 23, 2006

through December 7, 2006. The Court entered an order granting the Second Exclusivity Motion

on August 9, 2006.

>     8.    **Extension of Deadline to Assume or Reject Unexpired**
>            **Leases of Non-Residential Real Property Under**
>            **Section 365(d)(4) of the Bankruptcy Code**

Pursuant to section 365(d)(4) of the Bankruptcy Code, absent the entry of an order

by the Court, the Debtor had until May 24, 2006, in which to assume or reject all of its unexpired

nonresidential real property leases (i.e. the Leases). On April 25, 2006, the Debtor filed the

*Debtor's Motion for an Order Pursuant to Section 365(d)(4) of the Bankruptcy Code Extending*

*the Time to Assume, Assume and Assign, or Reject Unexpired Leases of Nonresidential Real*

*Property [Docket No. 447]* (the "365(d)(4) Extension Motion"). Pursuant to the 365(d)(4)

Extension Motion, the Debtor sought to extend its May 24, 2006 deadline by an additional 90

days, through and including August 22, 2003.  On May 22, 2006, the Court granted the 365(d)(4)

Motion entered an Order and extended the deadline through and including August 22, 2006.

### 9.    Assumption and Assignment of Certain NonResidential Real Property Leases to Purchaser

Under the terms of the Sale Order, and the Purchase Agreement between the

Purchaser and the Debtor, the Purchaser, among other things, obtained the right to designate

which Contracts and Leases of the Debtor it wished to have assumed and assigned to it by the

Debtor.  The Purchaser has exercised its designation rights under the Sale Order and Asset

Purchaser Agreement throughout the course of this Chapter 11 Case by instructing the Debtor to

effectuate the assumption and assignment of certain Leases to it.  On May 2, 2006, the Debtor

filed the *Debtor's Motion for Entry of an Order Authorizing the Debtor to Assume and Assign*

*Certain Lease Agreements Between Lessors and the Debtor [Docket No. 469]* (the "First

Assumption and Assignment Motion").  The Court subsequently granted the First Assumption

and Assignment Motion and authorized the assumption and assignment of 44 Leases to the

Purchaser.  On May 25, 2006, the Debtor filed the *Debtor's Motion for Entry of an Order*

*Authorizing the Debtor to Assume and Assign Certain Lease Agreements Between Lessors and*

*the Debtor [Docket No. 513]* (the "Second Assumption and Assignment Motion").  The Court

subsequently granted the Second Assumption and Assignment Motion and authorized the

assumption and assignment of 10 additional Leases to the Purchaser.  Finally, on August 4, 2006,

the Debtor filed *Debtor's Motion for Entry of an Order (I) Authorizing* the Debtor's *Immediate*

*Assumption and Assignment of Certain Leases to Max Rave, LLC, (II) Approving Procedures for*

*Resolving Disputed Cure Amounts in Connection Therewith, and (III) Extending the Deadline by*

*Which the Debtor Must Assume or Reject Certain Leases for Which the Debtor Has Obtained the*

*Written Consent of the Landlord* [Docket No. 611] and the supplement thereto [Docket No. 615]

(collectively, the "Third Assumption and Assignment Motion"). Pursuant to the Third

Assumption and Assignment Motion, the Debtor sought, among other things, the entry of an

order authorizing the assumption and assignment of an additional 410 Leases to the Purchaser.

On August 22, 2006, pursuant to the *Order Granting Debtor's Motion (I) Authorizing the*

*Debtor's Immediate Assumption and Assignment of Certain Leases to Max Rave, LLC,*

*(II) Approving Cure Determination Procedures, and (III) Extending the Deadline by Which the*

*Debtor Must Assume or Reject Certain Leases for Which the Debtor has Obtained the Written*

*Consent of the Landlord,* the Bankruptcy Court approved the assumption and assignment of 410

Leases to Max Rave and the rejection of 29 Leases. With the approval of the Third Assumption

and Assignment Motion, all of the Debtor's Leases have been disposed of through either

expiration, rejection or assignment to Max Rave.

## V.
## DESCRIPTION OF THE PLAN

A DISCUSSION OF THE PRINCIPAL PROVISIONS OF THE PLAN AS

THEY RELATE TO THE TREATMENT OF CLASSES OF ALLOWED CLAIMS AND

EQUITY INTERESTS IS SET FORTH BELOW. THE DISCUSSION OF THE PLAN WHICH

FOLLOWS CONSTITUTES A SUMMARY ONLY, AND SHOULD NOT BE RELIED UPON

FOR VOTING PURPOSES. YOU ARE URGED TO READ THE PLAN IN FULL IN

EVALUATING WHETHER TO ACCEPT OR REJECT DEBTOR'S PROPOSED PLAN OF

LIQUIDATION. IF ANY INCONSISTENCY EXISTS BETWEEN THIS SUMMARY AND

THE PLAN, THE TERMS OF THE PLAN CONTROL.  ALL CAPITALIZED TERMS NOT

OTHERWISE DEFINED HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.

## A.    **DESCRIPTION OF CLASSES**

The Plan divides Creditors into Classes.  Creditors with similar Claims are placed

in the same Class.  There are 7 Classes of Claims and 1 Class of Equity Interests under the Plan

as follow:

**Class 1 Claims**.  Class 1 shall consist of all Priority Claims Against the Debtor.

**Class 2(A) Claims.**  Class 2(A) shall consist of the Claims of any Creditor

secured by a Lien against the Purchased Assets.  Each Holder of a Class 2(A) Claim constitutes a

separate subclass under the Plan.

**Class 2(B) Claims**.  Class 2(B) shall consist of the Claims of any Creditor

secured by a Lien against Excluded Assets.  Each Holder of a Class 2(B) Claim constitutes a

separate subclass under the Plan.

**Class 3 Claims.**  Class 3 shall consist of the Claims of Unsecured Creditors

(i) whose collective Claims against the Debtor are equal to or less than $5,000 or who elect to

reduce their total Claims to $5,000, and (ii) who elect treatment in Class 3.

**Class 4 Claims.**  Class 4 shall consist of the Claims of Holders of each

Reclamation Claim whose Claim meets the Reclamation Settlement Parameters and who agrees

in writing to the treatment proposed for that Creditor's Reclamation Claim in Class 4.

**Class 5 Claims.**  Class 5 shall consist of the Claims of Holders of Unsecured

Claims.

**Class 6 Subordinated Claims**. Class 6 shall consist of the Claims of Holders of
Subordinated Claims.

**Class 7 Equity Interests**. Class 7 consists of all Equity Interests in the Debtor.

## B.    TREATMENT OF CLASSIFIED CLAIMS

**Class 1 (Priority Claims).** Class 1 shall consist of the Priority Claims. The
Debtor estimates that the amount of Class 1 Claims is approximately $135,000. Class 1 Claims
are impaired. The Liquidating Debtor shall pay from Net Plan Proceeds the Allowed amount of
each Class 1 Priority Claim to each Entity holding a Class 1 Priority Claim as soon as practicable
following the later of (a) the Effective Date and (b) the date such Class 1 Priority Claim becomes
an Allowed Claim (or as otherwise permitted by law). The Liquidating Debtor shall pay each
Entity holding a Class 1 Priority Claim in Cash in full in respect of such Allowed Claim without
interest accruing from the Petition Date; provided, however, that such Entity may be treated on
such less favorable terms as may be agreed to in writing by such Entity.

**Class 2(A) (Claims Secured by Liens on Purchased Assets).** Class 2(A) shall
consist of the Claims of any Creditor secured by a Lien against the Purchased Assets.[28]  The
Debtor estimates that the amount of Class 2(A) Claims is approximately $0. Each Holder of a
Class 2(A) Claim constitutes a separate subclass under the Plan. Class 2(A) Claims are
impaired. Each Holder (if any) of an Allowed Class 2(A) Claim shall receive on the Effective
Date or as soon as practicable thereafter, from the proceeds of the Purchase Price, Cash in an
amount equal to the value of the Creditor's interest in the Purchased Assets as full and complete
satisfaction of such Creditor's Class 2(A) Claim.

---

28 The Secured Claims of the Prepetition Lenders were satisfied by the Debtor.

**Class 2(B) (Claims Secured by Liens on Excluded Assets).** Class 2(B) shall

consist of the Claims of any Creditor secured by a Lien against the Excluded Assets. The Debtor

estimates that the amount of Class 2(B) Claims is approximately $0. Each Holder of a Class

2(B) Claim constitutes a separate subclass under the Plan. Class 2(B) Claims are impaired. At

the option of the Debtor or Liquidating Debtor, as applicable, (i) each Holder (if any) of an

Allowed Class 2(B) Claim shall receive on the Effective Date or as soon thereafter as practicable

the proceeds from any sale of the Excluded Assets securing such Claim in an amount equal to the

value of the Creditor's interest in the Excluded Assets securing such Claim in full and complete

satisfaction of such Claim, or (ii) the collateral securing such Creditor's Claim shall be

abandoned to such Creditor, in full and complete satisfaction of such Claim.

**Class 3 (Convenience Claims).** Class 3 shall consist of the Claims of Unsecured

Creditors (i) whose collective Claims against the Debtor are equal to or less than $5,000 or

Creditors who elect to reduce their total Claims to $5,000, and (ii) who elect treatment in Class 3.

Class 3 Claims are impaired. The Debtor estimates that the amount of Class 3 Claims is

approximately $744,000. Each Holder of an Allowed Class 3 Claim shall receive from Net Plan

Proceeds a Cash payment of forty percent (40%) of the Allowed amount of such Claim on the

Effective Date. Any creditor who elects treatment as a Class 3 Claimant shall be guaranteed a

forty percent (40%) distribution on account of its Allowed Claim, regardless of the actual Plan

Proceeds that are available for distribution under the Plan, that shall be immediately paid by the

Debtor and/or Liquidating Debtor on the Effective Date. This forty percent (40%) distribution to

Class 3 Claimants is fixed and will not vary, regardless of whether the Debtor and/or Liquidating

Debtor ultimately obtain Plan Proceeds that allow for a distribution less than or greater than forty

percent (40%) to Class 5 Claimants. The Debtor estimates that approximately 1,700 Claims are eligible for Class 3 treatment.

**Class 4 (Reclamation Claims (Settled)).** Class 4 shall consist of the Claims of Holders of each Reclamation Claim whose Claim meets the Reclamation Settlement Parameters and who agrees in writing to the treatment proposed for that Creditor's Reclamation Claim in Class 4. Each Holder of a Reclamation Claim who, in settlement of its Reclamation Claim, agrees in writing to the treatment proposed for such Claim in Class 4 shall be paid, in Cash, on the Effective Date or as soon thereafter as practicable, from the Reclamation Settlement Fund Amount, its pro rata share of such fund based upon the Reclamation Balance (Petition Date) for each such Claimant. For each Reclamation Claimant who agrees to treatment in Class 4, such Claimant shall be paid an amount equal to the Reclamation Settlement Payment Amount shown for that Claim on Schedule 1 to the Plan. The Reclamation Settlement Fund Amount is $850,000. Each Holder of a Reclamation Claim whose Claim is listed on Schedule 1 will have an opportunity to agree to the treatment of such Claim as a Class 4 Claim on the Ballot sent to that Creditor or at any time prior to the last date for that Claimant to object to Confirmation of the Plan. Any remaining Claim of a Class 4 Claimant in excess of the amount of the Reclamation Settlement Payment Amount shall be treated as a non-priority Unsecured Claim in Class 5 and shall be paid only to the extent it is an Allowed Unsecured Claim.

**Class 5 (Unsecured Claims).** Class 5 shall consist of the Claims of Holders of Unsecured Claims. The Debtor estimates that the amount of Class 5 Claims is approximately $41,000,000. Class 5 Claims are impaired. Each Holder of an Allowed Unsecured Claim shall

70

receive a Pro Rata share of the Net Plan Proceeds, as determined by the Liquidating Debtor
pursuant to the terms of this Plan.

**Class 6 (Subordinated Claims).**  Class 6 shall consist of the Claims of Holders
of Subordinated Claims.  Class 6 Subordinated Claims are impaired.  The value of the Plan
Assets will not be sufficient to satisfy the Claims of Classes 1, 2(A), 2(B), 3, 4 and 5 in full.
Accordingly, there shall be no distributions on Account of Class 6 Subordinated Claims.

**Class 7 (Equity Interests).**  Class 7 consists of all Equity Interests in the Debtor.
Class 7 Equity Interests are impaired.  The value of the Plan Assets will not be sufficient to
satisfy the Claims of Classes 1, 2(A), 2(B), 3, 4, 5 and 6 in full.  Accordingly, there shall be no
distribution on account of Class 7 Equity Interests.  After the entry of the Effective Date, the
Equity Interests will be canceled and will cease to exist.

C.    **TREATMENT OF UNCLASSIFIED CLAIMS**

**Administrative Claims.**  Each Holder of an Allowed Administrative Claim,
including claims under section 503(b)(9) of the Bankruptcy Code for the value of goods received
by the debtor within 20 days before the Petition Date in which the goods were sold to the Debtor
in the ordinary course of the Debtor's business, shall receive, from Net Plan Proceeds, Cash
equal to the Allowed amount of such Claim, unless such Holder shall have agreed to different
treatment of such Claim, at the sole option of the Debtor or the Liquidating Debtor, as the case
may be: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date
upon which the Bankruptcy Court enters a Final Order determining or approving such Claim;
(b) in accordance with the terms and conditions of agreements that either have been or may be
approved by the Bankruptcy Court between the Holders of such Claims and the Debtor or the

Liquidating Debtor, as the case may be; (c) with respect to Administrative Claims representing

obligations incurred in the ordinary course of the Debtor's business, upon such regular and

customary payment or performance terms as may exist in the ordinary course of the Debtor's

business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to

28 U.S.C. § 1930(a)(6), until the entry of a final decree or an order converting or dismissing the

case.

   **Professional Fee Claims.**  The Liquidating Debtor shall pay Professionals all of

their respective accrued and Allowed fees and reimbursement of expenses arising prior to the

Effective Date plus post-Effective Date fees approved by the Responsible Officer.  The

Bankruptcy Court must also rule on and allow all such Professional Fee Claims before the fees

will be owed and paid.  For all such pre-Effective Date Professional Fee Claims, except

Bankruptcy Clerk's Office fees, the fees and expenses of the Claims Agent, and U.S. Trustee's

fees, the Professional in question must file and serve a properly noticed final fee application and

the Bankruptcy Court must rule on the application.  Only the amount of fees and expenses

Allowed by the Bankruptcy Court will be owed and required to be paid under the Plan.

   **Priority Tax Claims.**  On the later to occur of (i) the Effective Date or (ii) the

date on which such Claim shall become an Allowed Claim, the Liquidating Debtor shall pay to

each Holder of an Allowed Priority Tax Claim from Net Plan Proceeds such Allowed Priority

Tax Claim without interest from the funds in the Claims Reserve Account.

**D.**  **TREATMENT OF RECLAMATION CLAIMS**

   Pursuant to the Plan, the Debtor proposes to compromise the Reclamation Claims

(Settled) by paying, in Cash, to each Reclamation Claimant who agrees in writing to the

treatment proposed for it in Class 4, the Reclamation Settlement Payment Amount set forth on

Schedule 1 to the Plan opposite the name of such Claimant.  The Confirmation Order will

constitute an order under Bankruptcy Rule 9019 compromising and settling the Reclamation

Claims (Settled).  All other Reclamation Claims are Disputed Claims and will be treated as non-

priority Unsecured Claims under Class 5 of the Plan and shall be paid only to the extent such

Claims are Allowed Claims.

The Debtor believes that the proposed compromise is fair, equitable, and

appropriate because none of the Reclamation Claims against the Debtor are valid as other than

non-priority Unsecured Claims.  This is because Bankruptcy Code section 546(c) has no remedy

for a reclaiming seller of goods other than recovery of the subject goods and the Debtor has

previously sold all of its goods.  In addition, many of the Reclamation Claimants are not "sellers

of goods" and persons who are not sellers of goods have no rights under Bankruptcy Code

section 546(c); certain Claims were not made within the time periods mandated by Bankruptcy

Code section 546(c); in many cases the goods had already been sold when the reclamation

demand was delivered to the Debtor or were subsequently sold by the Debtor; and in every case

the Claimant did not take affirmative steps to recover the goods through an adversary proceeding

or seek sequestration of the goods or otherwise seek judicial intervention before the goods were

sold by the Debtor.

The Debtor has determined the Reclamation Settlement Payment Amount for each

Claimant by using the Reclamation Settlement Parameters which are based, in part, upon the

requirements of section 546(c) of the Bankruptcy Code.  In this regard, pursuant to Bankruptcy

Code section 546(c), each potential Reclamation Claimant was entitled to attempt to reclaim

goods delivered to the Debtor within 45 days of the Petition Date by delivering a timely written

demand to the Debtor specifically covering the goods delivered to the Debtor during that time

period. Under the statute, goods delivered to the Debtor between December 11, 2005, and the

Petition Date were subject to reclamation if: (i) the Reclamation Claimant's written demand was

delivered to the Debtor between December 11, 2005, and February 14, 2006; and (ii) the goods

that were the subject of the written demand were still in the Debtor's possession on the date the

Debtor received the demand. However, none of the Reclamation Claimants took any steps to

recover the goods subject to reclamation before those goods were sold by the Debtor and,

therefore, such Claimants are not entitled to any treatment other than as the Holders of

Unsecured Claims.

        In order to compromise and settle the Reclamation Claims, the Debtor (with the

assistance of the Committee) has developed the following Reclamation Settlement Parameters:

The Debtor calculated for each Holder of a Reclamation Claim who made a timely written

demand covering goods that were (i) delivered to the Debtor within the 45 day period and

(ii) still in the possession of the Debtor on the date the demand was received by the Debtor, the

cost of the goods still in the Debtor's possession on the Petition Date -- defined in the Plan as the

"Reclamation Balance (Petition Date)." The total value of all such goods for all Holders of

Reclamation Claims -- i.e., the total value of all Reclamation Balances (Petition Date) -- was

approximately $572,000. This dollar figure ($572,000) was compared to approximately

$1,700,000, which was the value of the goods potentially subject to reclamation based upon the

value of the goods delivered to the Debtor within 45 days of the Petition Date and listed in the

reclamation notices from Claimants asserting Reclamation Claims. Given the Debtor's position

that the value of the Reclamation Claims was, from the Debtor's perspective, at best, zero

because of the failure or refusal of the Claimants to take any steps to enforce their claims before

the subject goods were sold, and, at worst, $572,000, based upon the remaining balance still in

the Debtor's possession on the Petition Date, and the competing position of the Claimants that

the value of the Reclamation Claims was approximately $1,700,000, the Committee determined

that $850,000 was a reasonable compromise and requested the Debtor to support settlement of

the Reclamation Claims at that level. Therefore, each Holder of a valid Reclamation Claim who

agrees in writing to treatment in Class 4 will be paid, in Cash, an amount equal to its percentage

share of $850,000. The percentage share for each Holder of a Reclamation Claim (Settled) is

based upon the ratio of such Claimant's Reclamation Balance (Petition Date) to the total of all

Reclamation Balances (Petition Date) for all Holders of Reclamation Claims. The Claim of any

Holder of a Reclamation Claim who does not accept treatment in Class 4 will be disputed by the

Debtor, its Reclamation Claim will be treated as an Unsecured Claim in Class 5, and its Claim

will be Allowed or Disputed as appropriate. Thus, the proposed compromise effectively

provides Reclamation Claimants with a priority in an amount greater than the value of the goods

subject to reclamation on hand as of the Petition Date even though such Claimants never took

any steps to recover the subject goods. **The amount of any Reclamation Claim that exceeds**

**the Reclamation Settlement Payment Amount listed for that Claimant on Schedule 1 to the**

**Plan shall be paid as an Unsecured Claim to the extent such Claim is an Allowed Claim.**

      The Debtor believes that this proposed compromise is fair and equitable because

section 546(c) of the Bankruptcy Code does not provide for Reclamation Claimants to receive an

administrative claim as a remedy and instead only provides such Claimants with the remedy of

recovering the goods that are the subject of a timely written demand; and none of the

Reclamation Claimants took any action to actually recover possession of the goods, either by

filing an adversary proceeding, moving for the turnover of the goods, or otherwise taking steps to

compel sequestration of the goods.

**The Committee fully supports the settlement embodied within Class 4 and
has obtained the approval of some of the largest holders of Reclamation Claims to this
proposed treatment.**

The Confirmation Order will constitute an order under Bankruptcy Rule 9019

compromising and settling the Reclamation Claims (Settled).

All Reclamation Claims that are not Reclamation Claims (Settled) are defined in

the Plan as Reclamation Claims (Disputed) and will be treated as non-priority Unsecured Claims

and will be paid only to the extent such Claims are Allowed Claims.

E.   **IMPLEMENTATION OF THE PLAN**

The Plan will be implemented as follows:

1.   **Available Cash.**

On or as soon as practical following the Effective Date, the Claims Reserve

Account shall be opened by the Disbursing Agent and funded with the Available Cash to the

extent of any unencumbered Cash, which funds shall constitute Plan Proceeds.  Thereafter, from

time to time, upon receipt of any Liquidation Proceeds or any Litigation Recovery, such funds

will be promptly delivered by the Liquidating Debtor to the Disbursing Agent for deposit into the

Claims Reserve Account and shall become part of the Plan Proceeds.

2.      **Handling of Plan Assets and Collection of Plan Proceeds.**

On the Effective Date, the Plan Assets and any other property of the Estate shall

revest in the Liquidating Debtor, free and clear of all Claims and Liens other than those Liens

recognized by this Plan.  The Plan Assets shall be held by the Liquidating Debtor in trust for

Creditors and shall be distributed only in accordance with this Plan.  From and after the Effective

Date, and subject to Section 5(X) of the Plan, the Liquidating Debtor shall retain and pursue the

Litigation on such terms and conditions as are consistent with the interests of Creditors and the

reasonable business judgment of the Liquidating Debtor, sell or liquidate Plan Assets, and collect

the accounts receivable, if any, of the Debtor.  In addition, from and after the Effective Date,

except as otherwise provided in this Plan or in the Confirmation Order, the Liquidating Debtor

shall be free to operate without any limitation or restriction by, and without any requirement to

comply with, the Bankruptcy Code, Bankruptcy Rules, or Guidelines of the United States

Trustee.  All Cash, all Liquidation Proceeds, and all Litigation Recoveries realized or obtained

by the Liquidating Debtor shall be promptly delivered to the Disbursing Agent for deposit into

the Claims Reserve Account and such funds shall be held in trust by the Disbursing Agent as

Plan Proceeds.  Except as otherwise provided in this Plan and the Confirmation Order, such Plan

Proceeds shall be free and clear of all Claims and Liens and shall only be expended in

accordance with the provisions of this Plan.  To the extent required to make distributions to the

Holders of Allowed Claims, fund the Claims Reserve Account, pay Plan Expenses, and

otherwise implement this Plan, all Plan Proceeds shall be held in trust by the Disbursing Agent

and shall be distributed to Creditors in accordance with section 1123 of the Bankruptcy Code.

3.     **Litigation.**

Except as otherwise provided in this Plan, all Litigation is retained and preserved

pursuant to section 1123(b) of the Bankruptcy Code.  From and after the Effective Date, subject

to Section 5(X) of the Plan, all Litigation will be prosecuted or settled by the Liquidating Debtor.

To the extent any Litigation is already pending on the Effective Date, the Liquidating Debtor as

successor to the Debtor will continue the prosecution of such Litigation.  Any Litigation

Recovery from the Litigation will be deposited in the Claims Reserve Account as Plan Proceeds.

With respect to certain avoiding actions, the Committee has undertaken a

preliminary review of potential preference actions and has advised the Debtor that the

Committee believes many potential preference defendants may have credible defenses under

Bankruptcy Code section 547(c)(2) (ordinary course of business) and Bankruptcy Code section

547(c)(4) (new value).  Because the expected return to creditors may be comparatively high in

this case and many potential preference defendants may have credible defenses, the Committee

has urged restraint in pursuing preference actions against Creditors who, even if held liable,

would have a significant portion of any preference liability returned to it as a further distribution

under Bankruptcy Code section 502(h).  Based upon the foregoing, it is unclear at this time

whether the Reorganized Debtor will be aggressively pursuing preference actions.  Nevertheless,

the Debtor and Reorganized Debtor reserve the right to commence preference actions and other

Litigation in all appropriate circumstances.

4.     **Payment of Plan Expenses**

Subject to Section 5(X) of the Plan, all Plan Expenses may be paid by the

Disbursing Agent from the Claims Reserve Account without further notice to Creditors or

approval of the Bankruptcy Court. The Confirmation Order shall advise creditors and other

parties in interest of the right to deliver a written request to the Liquidating Debtor for notice of

any post-Confirmation applications by the post-Confirmation professionals seeking approval of

post-Confirmation fees and expenses. Any disputes concerning the payment of Plan Expenses

shall be submitted to the Bankruptcy Court for resolution.

### 5. Distribution of Plan Proceeds.

The Plan Proceeds shall be used to satisfy the payments required under the Plan,

provided that the Disbursing Agent shall only distribute Net Plan Proceeds to the Holders of

Allowed Claims in such amounts and at such times as are set forth in this Plan. No payments or

distributions shall be made by the Disbursing Agent on account of Disputed Claims unless and to

the extent such Claims become Allowed Claims. The Net Plan Proceeds allocated to Disputed

Claims will not be distributed but will be held in the Claims Reserve Account by the Disbursing

Agent in accordance with this Plan pending resolution of such Disputed Claims.

### 6. Post-Confirmation Operations of the Liquidating Debtor.

Following the Effective Date, subject to Section 5(X) of the Plan, the Liquidating

Debtor shall sell or dispose of any remaining assets, collect any accounts receivable, generate

Liquidation Proceeds, prosecute or settle the Litigation, promptly transfer all receipts and

collections to the Disbursing Agent for deposit into the Claims Reserve Account, and generally

administer the Plan.

### 7. Power and Authority of Responsible Officer.

From and after the Effective Date, subject to Section 5(X) of the Plan, the

Liquidating Debtor will be managed and governed by the Responsible Officer who shall act as

the representative of the Liquidating Debtor. Activities of the Liquidating Debtor as permitted

and limited under this Plan will be managed by the Responsible Officer. The Responsible

Officer may use lower priced employees of his or her firm as he or she deems appropriate.

Compensation and reimbursement of the Responsible Officer, and any lower priced employees

from his or her firm, shall be considered Plan Expenses. Plan Expenses also includes

reimbursement of the reasonable out-of-pocket expenses of the members of the Post-

Confirmation Oversight Committee and the cost of any bond or insurance obtained under Section

8(H) of the Plan. Confirmation of the Plan shall constitute the appointment of the Responsible

Officer by the Bankruptcy Court as the representative of the Liquidating Debtor to (a) exercise

the rights, power and authority of the Liquidating Debtor under applicable provisions of the Plan

and bankruptcy and non-bankruptcy law, (b) subject to Section 5(X) of the Plan, retain

professionals to represent the Liquidating Debtor in performing and implementing the Plan,

(c) subject to Section 5(X) of the Plan, marshal and liquidate the Plan Assets and to collect the

Plan Proceeds for the benefit of Creditors, (d) subject to Section 5(X) of the Plan, prosecute the

Litigation and otherwise attempt to collect or realize upon the Plan Assets, (e) subject to Section

5(X) of the Plan, resolve Disputed Claims and effectuate distributions to Creditors under the

Plan, and (f) otherwise implement the Plan, wind up the affairs of the Debtor and close the

Chapter 11 Case. On the Effective Date, the Responsible Officer will be deemed to have

retained the Debtor's Professionals under the arrangements existing on the Effective Date,

without any need for new retention agreements or further orders of the Bankruptcy Court. The

Confirmation Order shall provide that the Responsible Officer is authorized to execute a

certificate of dissolution for the Liquidating Debtor pursuant to applicable non-bankruptcy law,

at such time as the Liquidating Debtor has fully wound up its affairs in accordance with

applicable law pursuant to the provisions of the Plan. The Responsible Officer shall serve until

the Liquidating Debtor is dissolved and a final decree is entered closing the Chapter 11 Case,

unless earlier removed by the Bankruptcy Court for cause shown, after notice and a hearing.

Upon the removal of the Responsible Officer for cause, the Post-Confirmation Oversight

Committee shall select a replacement Responsible Officer; in all other instances, if the sitting

Responsible Officer becomes unable, unavailable or unwilling to continue to serve, Corporate

Revitalization Partners, LLC will select a replacement, subject to the approval of the Post-

Confirmation Oversight Committee; provided, however, if the Post-Confirmation Oversight

Committee fails or refuses to accept the nominee of Corporate Revitalization Partners, then the

Post-Confirmation Oversight Committee may select the successor to the Responsible Officer.

### 8.    Liquidation and Dissolution of the Liquidating Debtor.

The Liquidating Debtor shall conduct no business following the Effective Date

other than winding up its affairs in accordance with applicable law and the provisions of this

Plan. Without limiting the generality or effect of the foregoing, following the Effective Date,

subject to Section 5(X) of the Plan, the Liquidating Debtor shall: (i) undertake those transactions

that are necessary, advantageous or practicable to obtain the maximum value from the Plan

Assets; and (ii) exercise its best efforts and endeavor in good faith and without undue delay to

liquidate all of the Plan Assets and to successfully prosecute the Litigation. Pursuant to

applicable bankruptcy and non-bankruptcy law, the Liquidating Debtor (acting through the

Responsible Officer) shall be authorized to (i) wind up its affairs and dissolve, and (ii) put into

effect and carry out the terms of the Plan and any orders of the Bankruptcy Court entered in the

Chapter 11 Case, without further action by its Board of Directors or stockholders.

### 9. Full and Final Satisfaction.

Commencing upon the Effective Date, the Disbursing Agent shall be authorized

and directed to distribute the amounts required under the Plan to the Holders of Allowed Claims

according to the provisions of the Plan. Upon the Effective Date, all Debts of the Debtor shall be

deemed fixed and adjusted pursuant to this Plan and the Debtor shall have no further liability on

account of any Claims or Equity Interests except as set forth in this Plan. All payments and all

distributions made by the Disbursing Agent under the Plan shall be in full and final satisfaction,

settlement and release of all Claims; provided, however, that nothing contained in Section 5(I) of

the Plan, or in any other provision of the Plan, shall be deemed to constitute or result in a

discharge of the Debtor under Bankruptcy Code section 1141(d).

### 10. Distribution Procedures.

Except as otherwise agreed by the Holder of a particular Claim, or as provided in

this Plan, all amounts to be paid by the Disbursing Agent under the Plan shall be distributed in

such amounts and at such times as is reasonably prudent. On the Effective Date, or as soon as

practicable thereafter, the Disbursing Agent shall: (i) marshal all then available Plan Proceeds;

(ii) to the extent of unencumbered Cash or Cash distributable to the Holders of Allowed Claims,

establish and fund the Claims Reserve Account pursuant to Section 5(L) of the Plan;

(iii) promptly pay the Holders of (a) Allowed Administrative Claims, (b) Allowed Professional

Fee Claims, (c) Allowed Priority Tax Claims and (d) the Holders of Allowed Claims in Class 1,

Class 2(A), Class 2(B), Class 3, Class 4 and Class 5 – as provided for under the Plan; (iv) with

respect to Class 2(B) Claimants who did not receive proceeds from the sale of the Excluded

Assets, arrange for the Liquidating Debtor to abandon to such Creditors the collateral securing

their respective Claims; and (v) make interim and final distributions of Plan Proceeds to the

Holders of Allowed Class 5 Claims from the Claims Reserve Account in the amounts and

according to the priorities set forth in this Plan.  Notwithstanding any provision to the contrary in

this Plan, distributions may be made in full or on a Pro Rata basis depending on (i) the amount of

the Allowed Claim, (ii) the then available Plan Proceeds in the Claims Reserve Account, and

(iii) the then anticipated Plan Proceeds.  The Disbursing Agent shall make the Cash payments to

the Holders of Allowed Claims: (a) in U.S. dollars by check, draft or warrant, drawn on a

domestic bank selected by the Disbursing Agent in its sole discretion, or by wire transfer from a

domestic bank, at the Disbursing Agent's option, and (b) by first-class mail (or by other

equivalent or superior means as determined by the Disbursing Agent).

### 11.    **Disbursing Agent.**

The Disbursing Agent may employ or contract with other entities to perform the

obligations created under the Plan.  Any third party Disbursing Agent shall receive reasonable

compensation for services rendered and reimbursement for expenses incurred in connection with

this Plan or any functions or responsibilities adopted under the Plan which amounts may be

deducted from the Claims Reserve Account as Plan Expenses. The Disbursing Agent shall be

empowered to (i) effect all actions and execute all agreements, instruments, and other documents

necessary to perform its duties under the Plan, (ii) make all distributions contemplated hereby,

(iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such

other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court,

pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to

implement the provisions hereof.  To the extent that the Liquidating Debtor acts as the

Disbursing Agent, the Liquidating Debtor shall not receive a fee for such services, although the

Liquidating Debtor may employ and pay persons or entities salaries, wages or ordinary

compensation for services performed.

### 12.    Claims Reserve Account.

On or as soon as practicable after the Effective Date, the Disbursing Agent shall

(a) to the extent of any Cash or, where applicable, unencumbered Cash, create and fund the

Claims Reserve Account, and (b) periodically deposit the Cash from Plan Proceeds into the

Claims Reserve Account to satisfy the obligations created under the Plan.  The Claims Reserve

Account shall contain the following six sub-accounts:  (1) Secured, (2) Administrative,

(3) Priority Claims, (4) Reclamation Claims (Settled), (5) Plan Expenses, and (6) Allowed

Unsecured Claims.  Each sub-account within the Claims Reserve Account shall contain an

amount of Cash deemed sufficient by the Liquidating Debtor for the payment of Allowed Claims

in accordance with the priorities and amounts set forth in Article 3 of the Plan, all anticipated

Plan Expenses, and Disputed Claims.  The Disbursing Agent shall be authorized to transfer funds

among sub-accounts as necessary to replenish any sub-accounts as and when distributions are

made to Creditors.  All Plan Expenses may be deducted and paid from sub-account 5 without

further order of the Bankruptcy Court.  Subject to the priorities established under the Bankruptcy

Code, the Disbursing Agent shall periodically transfer all earnings and interest income on the

Claims Reserve Account for deposit to and distribution from sub-account 6.  Unless otherwise

provided in the Confirmation Order, the Claims Reserve Account shall be invested by the

Disbursing Agent in a manner consistent with the objectives of section 345(a) of the Bankruptcy
Code.

### 13.    Resolution of Disputed Claims.

The Liquidating Debtor intends to object to any Claim or portion of a Claim that
it does not believe should be Allowed.  The Plan contains provisions for interim and partial
distributions with respect to Claims.  Where only a portion of a Claim is Disputed, the Debtor
reserves the right to make an interim distribution on the portion of any such Claim that is not
Disputed in situations where the portion of such Claim that is not Disputed is in a liquidated
amount and is capable of being paid separately from the balance of such Claim.  But, in any
event, nothing in the Plan should be construed as waiving the Debtor's right to object to Claims
after Confirmation.

All objections to Claims shall be filed and served not later than 90 days following
the Effective Date; provided, however, such date may be extended beyond 90 days by the
Bankruptcy Court for cause shown.  If an objection is not timely filed by the deadline established
in Section 5(M) of the Plan, any remaining Disputed Claims shall be deemed to be Allowed
Claims for purposes of this Plan.  Unless otherwise provided in the Confirmation Order, subject
to Section 5(X) of the Plan, the Liquidating Debtor shall be authorized to settle, or withdraw any
objections to, any Disputed Claim following the Confirmation Date without further notice to
Creditors or authorization of the Bankruptcy Court, in which event such Claim shall be deemed
to be an Allowed Claim in the amount compromised for purposes of this Plan.  Under no
circumstances will any distributions be made on account of Disallowed Claims.

14.    **Reserve Provisions for Disputed Claims.**

The Disbursing Agent shall implement the following procedures with respect to

the allocation and distribution of Cash in the Claims Reserve Account, after payment of all

senior Claims, to the Holders of Disputed Claims that become Allowed Claims:

Cash respecting Disputed Claims shall not be distributed, but, if
necessary, shall be withheld by the Disbursing Agent in an amount equal
to the amount of the distributions that would otherwise be made to the
Holders of such Claims if such Claims had been Allowed Claims, based
on the Disputed Claims Amount.

All Holders of Allowed Unsecured Claims shall be entitled to
receive interim distributions under the Plan. No distributions may be
made to the Holders of Allowed Unsecured Claims unless adequate
reserves are established for the payment of Disputed Claims, and
sufficient funds are also reserved for payment of expected Plan Expenses.
Upon the Final Resolution Date, after payment of all senior Claims, all
amounts (if any) remaining in sub-accounts 1-5 of the Claims Reserve
Account, after reservation of an appropriate amount for anticipated Plan
Expenses, shall be transferred to sub-account 5 for final distribution to the
Holders of Allowed Class 5 Claims.

Where only a portion of a Claim is Disputed, at the option of the
Liquidating Debtor or Disbursing Agent, as applicable, interim or partial
distributions may (but are not required to) be made with respect to the
portion of such Claim that is not Disputed.

For the purposes of effectuating the provisions of this Section
5(N), the Bankruptcy Court may estimate the amount of any Disputed
Claim pursuant to section 502(c) of the Bankruptcy Code, in which event
the amounts so fixed or liquidated shall be deemed to be Allowed Claims
pursuant to section 502(c) of the Bankruptcy Code for purposes of
distribution under this Plan. In lieu of estimating the amount of any
Disputed Claim, the Bankruptcy Court or the Disbursing Agent may
determine the Disputed Claims Amount to be reserved for such Disputed
Claim, or such amount may be fixed by agreement in writing by and
between the Liquidating Debtor and the Holder thereof.

When a disputed Claim becomes an Allowed Claim, there shall be
distributed to the Holder of such Allowed Claim, in accordance with the
provisions of this Plan, Cash equal to a Pro Rata Share of the Cash set
aside for Disputed Claims within the applicable sub-account of the Claims
Reserve Account, but in no event shall such Holder be paid more than the

amount that would otherwise have been paid to such Holder if the Claim
(or the Allowed portion of the Claim) had not been a Disputed Claim.

Interim distributions may be made from time to time to the Holders
of Allowed Claims prior to the resolution by Final Order or otherwise of
all Disputed Claims, provided that interim distributions shall be made no
less frequently than once during each four month period following the
month of the Initial Distribution Date, and further provided that the
aggregate amount of Cash to be distributed at such time from the Claims
Reserve Account is practicable in comparison to the anticipated costs of
such interim distributions.  Notwithstanding the foregoing, subject to
Section 5(Q) of the Plan, no interim distribution shall be made to any
Creditor whose distribution would be less than $50.

No Holder of a Disputed Claim shall have any Claim against the
Cash reserved with respect to such Claim until such Disputed Claim shall
become an Allowed Claim.  In no event shall any Holder of any Disputed
Claim be entitled to receive (under the Plan or otherwise) from the Debtor,
the Liquidating Debtor, or the Claims Reserve Account any payment
(x) which is greater than the amount reserved for such Claim by the
Bankruptcy Court pursuant to this Section 5(N), or (y) except as otherwise
permitted under this Plan, of interest or other compensation for delays in
distribution.  In no event shall the Liquidating Debtor have any
responsibility or liability for any loss to or of any amount reserved under
the Plan.

To the extent a Disputed Claim ultimately becomes an Allowed
Claim in an amount less than the Disputed Claim Amount reserved for
such Disputed Claim, then the resulting surplus of Cash shall be retained
in the Claims Reserve Account and shall be distributed among the Holders
of Allowed Claims until such time as each Holder of an Allowed Claim
has been paid the Allowed amount of its Claim.

### 15.   Allocation of Distributions.

Distributions to any Holder of an Allowed Claim shall be allocated first to the

principal amount of any such Allowed Claim, as determined for federal income tax purposes, and

then, to the extent the consideration exceeds such amount, to the remainder of such Claim

comprising interest, if any (but solely to the extent that interest is an allowable portion of such

Allowed Claim).

16.    **Rounding.**

Whenever any payment of a fraction of a cent would otherwise be called for, the

actual distribution shall reflect a rounding of such fraction down to the nearest cent.

17.    **No Interim Cash Payments of $50
or Less on Account of Allowed Claims.**

If an interim distribution to be received by the Holder of an Allowed Claim would

be $50 or less, notwithstanding any contrary provision in the Plan, at the discretion of the

Disbursing Agent, no such interim payment will be made to such Holder, and such Cash shall be

held for such Holder until the earlier of (i) the next time an interim distribution is made to the

Holders of Allowed Claims (unless the distribution would still be less than $50 in which case

Section 5(Q) of the Plan shall again apply), or (ii) subject to Section 5(W) of the Plan, the date

on which final distributions are made to the Holders of Allowed Claims.

18.    **Disputed Payments.**

In the event of any dispute between and among Creditors as to the right of any

Entity to receive or retain any payment or distribution to be made to such Entity under the Plan,

the Disbursing Agent may, in lieu of making such payment or distribution to such entity, instead

hold such payment or distribution until the disposition thereof shall be determined by the

Bankruptcy Court.

19.    **Unclaimed Property.**

Any entity which fails to claim any Cash within 60 days from the date upon

which a distribution is first made to such entity shall forfeit all rights to any distribution under

the Plan.  Upon forfeiture, such Cash (including interest thereon) shall be deposited into the

Claims Reserve Account to be distributed to the Holders of Allowed Claims in the manner

described in Section 5(N)(vii) of the Plan for distribution of excess amounts. Entities which fail

to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the

Debtor, the Liquidating Debtor, or the Disbursing Agent or any Holder of an Allowed Claim to

whom distributions are made by the Disbursing Agent.

        20.    **Setoffs.**

        Nothing contained in the Plan shall constitute a waiver or release by the Debtor

and/or Liquidating Debtor of any right of setoff or recoupment the Debtor and/or Liquidating

Debtor may have against any Creditor or Equity Interest Holder.

        21.    **No Distributions on Late-Filed Claims.**

        Except as otherwise provided in a Final Order of the Bankruptcy Court, any

Claim as to which a Proof of Claim was first filed after the applicable Bar Date shall be a

Disallowed Claim, and the Liquidating Debtor shall not make any distribution to a Holder of

such a Claim; provided, however, that to the extent such Claim was listed in the Schedules (other

than as contingent, disputed, or unliquidated) and would be an Allowed Claim but for the lack of

a timely proof of Claim, the Liquidating Debtor shall treat such Claim as an Allowed Claim in

the amount in which it was so listed.

        22.    **Withholding Taxes.**

        Pursuant to section 346(f) of the Bankruptcy Code, the Disbursing Agent shall be

entitled to deduct any federal, state or local withholding taxes from any Cash payments made

with respect to Allowed Claims, as appropriate. The Debtor shall comply with all reporting

obligations imposed on it by any Governmental Unit.

23.    **De Minimis Distributions; Charitable Donation**.

Notwithstanding anything to the contrary therein, the Disbursing Agent shall not

be required to make a distribution to any Creditor if the dollar amount of the distribution is so

small that the cost of making that distribution exceeds the dollar amount of such distribution.  At

the Final Distribution Date, the Responsible Officer may decide in consultation with the Post-

Confirmation Oversight Committee to make a charitable donation with undistributed funds if, in

the reasonable judgment of the Responsible Officer, the cost of calculating and making the final

distribution of the remaining funds is excessive in relation to the benefits to the Creditors who

would otherwise be entitled to such distributions.

24.    **Post-Confirmation Oversight Committee**.  The Post-Confirmation

Oversight Committee shall be comprised of five (5) members selected by the Committee on or

prior to the Effective Date.  The members of the Post-Confirmation Oversight Committee shall

not be compensated such service on such Committee but shall be entitled to reimbursement of

reasonable out-of-pocket expenses.  The role of the Post-Confirmation Oversight Committee

shall be limited to consulting with the Responsible Officer on the following matters:  (i) the

timing and amount of interim distributions; (ii) the prosecution or settlement of the Litigation;

(iii) the resolution of Disputed Claims; (iv) the disposition of Excluded Assets; (v) the retention

of professionals other than the professionals serving already as Professionals for the Debtor or

the Committee on the Effective Date; (vi) any proposed contingent fee or bonus arrangements

with professionals engaged after the Effective Date; and (vii) the incurring of Plan Expenses,

other than legal or professional fees and expenses, in excess of $10,000 incurred in any calendar

month after the Effective Date or such greater amount as may be agreed to in advance between

the Post-Confirmation Oversight Committee and the Responsible Officer.  In the event of the

death, resignation or removal of any member of the Post-Confirmation Oversight Committee, a

replacement may be selected by the remaining members.  In the event of the death, resignation,

or removal of all members of the Post-Confirmation Oversight Committee, the Responsible

Officer shall be free to act in its sole discretion subject to the requirements of this Plan and the

Confirmation Order.  Any member of the Post-Confirmation Oversight Committee may be

removed by the Bankruptcy Court for cause shown, after notice and a hearing.  The Post-

Confirmation Oversight Committee may retain legal counsel to advise it in the performance of its

duties under Section 5(X) of the Plan.  The reasonable fees and expenses of such legal counsel

shall be a Plan Expense.  Compensation arrangements with the Responsible Officer shall be

subject to approval by the Post-Confirmation Oversight Committee, unless earlier approved by

the Committee.

### 25.    Issuance of New Common Stock.

On or as soon as practicable after the Effective Date the New Common Stock

shall be issued by the Liquidating Debtor to the Responsible Officer to be held on behalf of and

as the representative of all Holders of Allowed Claims.  Each Holder of an Allowed Claim shall

be deemed to hold an undivided beneficial Pro Rata interest in the New Common Stock based

upon the priority and Allowed amount of such Holder's Claim.  The New Common Stock shall

be treated as a Plan Asset and any proceeds of the New Common Stock shall be distributed as

Plan Proceeds to the Holders of Allowed Claims in accordance with the distributive provisions of

this Plan.

26.    **Purchaser Indemnity.**

Pursuant to Section 2.5(h) of the Purchase Agreement, the Purchaser has provided

an indemnity to the Debtor against rejection damage claims in the event that (i) fewer than 450

of the Debtor's store leases are designated by the Purchaser for assumption and assignment to the

Purchaser or the requisite number of store leases are not assumed or assigned to the Purchaser for

reasons other than the Debtor's breach of its obligation under the Purchase Agreement to seek

assumption and assignment of such leases to the Purchaser or such other breach of the Debtor

under the Purchase Agreement that causes the subject lease not to be assumed and assigned to

the Purchaser; or (ii) the Debtor's distribution center in New Jersey is not designated by the

Purchaser for assumption or assignment to the Purchaser or such distribution center lease is not

assumed or assigned to the Purchaser for reasons other than the Debtor's breach of its obligation

under the Purchase Agreement to seek assumption and assignment of such lease to the Purchaser

or such other breach under of the Debtor the Purchase Agreement that causes the subject lease

not to be assumed and assigned to the Purchaser.  The inability to assume and assign the requisite

leases to the Purchaser for reasons such as the Purchaser's failure, refusal, or inability to

promptly pay the cure amounts that are required to be paid by the Purchaser under the Purchase

Agreement, the failure, refusal or inability of the Purchaser to provide adequate assurance of

future performance, or the failure, refusal or inability of the Purchaser to comply with the

shopping center requirements of Bankruptcy Code section 365, are not breaches of the Debtor's

obligations.  Generally speaking, and subject in all respects to the formulas set forth in Section

2.5(h) of the Purchase Agreement, under the provisions of the Purchase Agreement governing

the Purchaser Indemnity, the Purchaser is required to pay to the Debtor for each rejected store

lease under the number that should have been assumed and assigned to the Purchaser pursuant to

the Purchase Agreement, and for the New Jersey warehouse lease, an amount equal to the

rejection damage claim of such lessors multiplied by percentage distribution to Unsecured

Creditors under the Plan, which percentage is determined from the pool of Allowed Unsecured

Claims without inclusion of the rejection damage claims for which indemnity is being provided.

**F.**    **EXECUTORY CONTRACTS**

  **1.**    **Rejection of Executory Contracts and Unexpired Leases**

    Except with respect to executory contracts or unexpired leases that were

(i) previously assumed or rejected by order of the Bankruptcy Court, (ii) are the subject of a

pending motion to assume or reject, pursuant to section 365 of the Bankruptcy Code, or (iii) are

subject to designation by the Purchaser pursuant to the Sale Order and which are set forth in any

Plan Supplement which may be filed by the Debtor, on the Effective Date, each executory

contract and unexpired lease entered into by Debtor prior to the Petition Date that has not

previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to

Section 365 of the Bankruptcy Code. Nothing in Section 6 of the Plan shall be construed as an

acknowledgement that a particular contract or agreement is executory or is properly

characterized as a lease. The Confirmation Order shall constitute an Order of the Bankruptcy

Court approving such rejections pursuant to Section 365 of the Bankruptcy Code, as of the

Effective Date. The non-Debtor parties to any rejected personal property leases shall be

responsible for taking all steps necessary to retrieve the personal property that is the subject of

such executory contracts and leases.

2.    **Claims Based on Rejection of Executory**
    **Contracts or Unexpired Leases**

All proofs of claim with respect to Claims arising from the rejection of executory

contracts or unexpired leases pursuant to Confirmation of the Plan, if any, must be Filed with the

Bankruptcy Court within thirty (30) days after the earlier of the date of entry of the Effective

Date or an order of the Bankruptcy Court approving such rejection. Any Claims arising from the

rejection of an executory contract or unexpired lease pursuant to Confirmation of the Plan that is

not Filed within such times will be forever barred from assertion against Debtor, the Liquidating

Debtor, or the Estate and its property. All such Claims for which proofs of claim are timely and

properly Filed and ultimately Allowed will be treated as Unsecured Claims subject to the

provisions of Article 3 of the Plan.

G.    **CONDITIONS TO CONFIRMATION OF THE PLAN**

Confirmation of this Plan is conditioned upon the Court signing the Confirmation

Order. If the Court does not sign the Confirmation Order, then the Debtor may, at its option,

withdraw this Plan and, if withdrawn, this Plan shall be of no further force or effect. Provided no

stay of the Confirmation Order is then in effect, this Plan shall become effective on the Effective

Date.

H.    **EFFECTS OF CONFIRMATION**

1.    **Binding Effect of Plan**

The provisions of the confirmed Plan shall bind the Debtor, the Liquidating

Debtor, any Entity acquiring property under the Plan, and any Creditor or Equity Interest Holder,

whether or not such Creditor or Equity Interest Holder has filed a Proof of Claim or Interest in

the Chapter 11 Case, whether or not the Claim of such Creditor or the Interest of such Equity

Interest Holder is impaired under the Plan, and whether or not such Creditor or Equity Interest

Holder has accepted or rejected the Plan. All Claims and Debts shall be as fixed and adjusted

pursuant to this Plan. Pursuant to Section 10(L) of the Plan, with respect to any taxes of the kind

specified in Bankruptcy Code section 1146(c), this Plan shall also bind any taxing authority,

recorder of deeds or similar official for any county, state, or governmental unit or parish in which

any instrument related to under this Plan or related to any transaction contemplated under this

Plan is to be recorded.

### 2. Revesting of Property of Debtor.

Upon the Effective Date, other than with respect to the Purchased Assets, title to

all property of the Estate of the Debtor in the Chapter 11 Case shall revest in the Liquidating

Debtor, free and clear of any Liens or Claims except those Liens and Claims expressly preserved

by this Plan or the Confirmation Order, and shall be retained by the Liquidating Debtor for the

purposes contemplated under the Plan. Without limiting the generality of the foregoing, all

Litigation Recoveries, rights to Liquidation Proceeds, and all resulting Plan Proceeds earmarked

for disbursement to Creditors under the Plan, shall vest in the Liquidating Debtor upon the

Effective Date and shall no longer constitute property of the Estate.

### 3. Property Free and Clear.

Except as otherwise provided in this Plan or the Confirmation Order, all property

that shall revest in the Liquidating Debtor shall be free and clear of all Claims, including Liens,

interests, charges or other encumbrances of Creditors or Equity Interest Holders, other than Liens

specifically recognized and continued under this Plan. Following the Effective Date, the

Liquidating Debtor may transfer and dispose of any such property free of any restrictions

imposed by the Bankruptcy Code or the Bankruptcy Rules and without further approval of the

Bankruptcy Court or notice to Creditors, except as may otherwise be required under the Plan or

the Confirmation Order.

### 4.  **Limitation of Liability.**

The Debtor, the Committee, and their respective officers, directors, managers,

employees, agents, advisors, accountants, attorneys and representatives (collectively, the

"Exculpated Parties"), will neither have nor incur any liability to any entity for any action in

good faith taken or omitted to be taken in connection with or related to the Chapter 11 Case or

the formulation, preparation, dissemination, implementation, Confirmation or consummation of

the Plan, the Disclosure Statement, or any agreement created or entered into in connection with

the Plan or incident to the Chapter 11 Case; provided, however, that this limitation will not affect

or modify the obligations created under this Plan, or the rights of any Holder of an Allowed

Claim to enforce its rights under the Plan.

### 5.  **Releases.**

As part of the Plan, the releases set forth below shall be granted pursuant to this

Plan and the Confirmation Order:

a.  **Debtor's Release.** On the Effective Date, subject to the Preserved

Setoff Rights, the Debtor and Liquidating Debtor shall release and be permanently enjoined from

any prosecution or attempted prosecution of any and all Litigation or potential Litigation which it

has or may have against any of its present or former directors, controlling shareholders, officers,

agents, financial advisors, attorneys, employees, partners, affiliates, representatives and their

respective property; provided, however, that the foregoing shall not operate as a waiver of or

release from any Litigation or potential Litigation arising out of (i) any express contractual

obligation owing by any such directors, officers, agents, financial advisors, attorneys, employees,

partners, affiliates or representatives, or (ii) the willful misconduct or gross negligence of such

directors, officers, agents, financial advisors, attorneys, employees, partners, affiliates, or

representatives in connection with, related to, or arising out of the Chapter 11 Case, the pursuit

of Confirmation of the Plan, the Consummation of the Plan, the administration of the Plan, or the

property to be distributed under the Plan.

In addition, on the Effective Date, the Debtor and Liquidating Debtor shall release

and be permanently enjoined from any prosecution or attempted prosecution of any and all

Litigation or potential Litigation against the Prepetition Lenders, the Stalking Horse Bidder and

PCM-Rave LLC, their respective successors and assigns, and their respective directors, officers,

agents, financial advisors, attorneys, employees, or representatives, in their capacity as lenders

under the Prepetition Facility and/or DIP financing, and their respective property, in connection

with (i) actions taken as or in its capacity of a lender under the Prepetition Facility and/or DIP

financing or (ii) the Chapter 11 Case.

In addition, on the Effective Date, subject to the Preserved Setoff Rights, and

except as otherwise provided in the Plan or in the Confirmation Order, the Debtor and the

Liquidating Debtor, the Committee and each of its past or current members, Prepetition Lenders,

the Stalking Horse Bidder and PCM-Rave LLC, and their respective successors and assigns in

their capacity as lenders under the Prepetition Facility and/or DIP financing, and their respective

members, officers, directors, controlling shareholders, agents, financial advisors, attorneys,

employees, partners, and representatives, and their respective property, shall be released from

any and all Litigation or potential Litigation which the Debtor and Liquidating Debtor may be

entitled to assert, whether for tort, fraud, contract, violations of federal or state securities laws, or

otherwise, whether known or unknown, forseen or unforseen, existing or thereafter arising, based

in whole or in part upon any act or omission, transaction, or other occurrence taking place on or

before the Confirmation, in any way relating to the Chapter 11 Case or the Plan, including, but

not limited to, the negotiation, solicitation, Confirmation and Consummation of the Plan;

provided, however, that nothing shall release any person from any claims, obligations, rights,

causes of action, or liabilities based upon any act or omission in connection with, relating to, or

arising out of, the Chapter 11 Case, the solicitation of acceptances of the Plan, the pursuit of

Confirmation of the Plan, the Consummation of the Plan, the administration of the Plan, or the

Property to be distributed under the Plan arising out of such person's gross negligence or willful

misconduct.  No attorney shall seek a release in contravention of DR 6-102 of the Lawyer's

Code of Professional Responsibility adopted by the New York State Bar Association, as

amended.

As set forth in the Plan, the "Preserved Setoff Rights" enable the Debtor, the

Liquidating Debtor, and the Estate to assert claims, debts, or causes of action against any Entity

that is otherwise released under the Plan as a defense to, and in reduction of, any Claim asserted

by such Entity against the Debtor, the Liquidating Debtor, or the Estate, notwithstanding the

release under the Plan.

b.    **Other Releases.**  Each person or entity participating in

distributions under the Plan or pursuant to the Plan, for itself and its respective successors,

assigns, transferees, current and former officers, directors, agents, financial advisors, attorneys,

employees, partners, affiliates, representatives, in each case in their capacity as such, shall by

virtue of its acceptance of the payments made to it under this Plan, and each member of each

Class that votes to accept or who is bound by this Plan, shall, by virtue of Bankruptcy Code

Section 1126(c) and 1141(a), be deemed to have released any and all Claims and causes of action

against (A) the Debtor or Liquidating Debtor, and their respective officers, directors, controlling

shareholders, managers, employees, agents, advisors, accountants, attorneys and representatives

and their respective property, (B) the Prepetition Lenders, the Stalking Horse Bidder and PCM-

Rave LLC, and their successors and assigns, in their capacity as lenders under the Prepetition

Facility and/or DIP financing, and their respective members, officers, directors, agents, financial

advisors, attorneys, employees, partners, and representatives, and their respective property, and

(C) the members of the Committee in their capacity as such, and their respective officers,

directors, managers, employees, agents, advisors, accountants, attorneys and representatives and

their respective property, arising prior to the Effective Date; provided, however, nothing in this

section shall be construed to release or exculpate any person or entity from fraud, gross

negligence, willful misconduct, criminal conduct, unauthorized use of confidential information

that causes damages or for personal ultra vires acts; provided, further that this section shall not

apply to the United States of America or to any Federal Agency thereof.  Nothing in the previous

sentence shall be deemed to release the Debtor and Liquidating/Debtor from liability for

(i) Claims filed before the Administrative Claims Bar Date, the Amended Schedule Bar Date, the

General Bar Date and the Governmental Bar Date, and (ii) Claims scheduled by the Debtor that

are not contingent, disputed or unliquidated; provided, however, that, notwithstanding clause (i)

above, the Debtor or Liquidating Debtor, as appropriate, may object to the allowance of any

Claim on any ground.

Each party to which this section of the Plan applies shall be deemed to have

granted the releases set forth herein notwithstanding that it may hereafter discover facts in

addition to, or different from, those which it now knows or believes to be true, and without

regard to the subsequent discovery or existence of such different or additional facts, and such

party expressly waives any and all rights that it may have under any statute or common law

principle, including section 1542 of the California Civil Code, which would limit the effect of

such releases to those Claims or causes of action actually known or suspected to exist at the time

of Confirmation.  Section 1542 of the California Civil Code generally provides as follows:  "A

general release does not extend to claims which the creditors does not know or suspect to exist in

his favor at the time of executing the Release, which if known by him must have materially

affected his settlement with the debtor."

### 6.    Injunction.

In implementation of the Plan, except as otherwise expressly provided in the

Confirmation Order or the Plan, and except in connection with the enforcement of the terms of

the Plan or any documents provided for or contemplated in the Plan, all entities who have held,

hold or may hold Claims against or Equity Interests in the Debtor, the Liquidating Debtor or the

Estate that arose prior to the Effective Date are permanently enjoined from: (a) commencing or

continuing in any manner, directly or indirectly, any action or other proceeding of any kind

against the Debtor, the Liquidating Debtor, the Estate, or any property of the Debtor, the

Liquidating Debtor, or the Estate, with respect to any such Claim or Equity Interest; (b) the

enforcement, attachment, collection or recovery by any manner or means, directly or indirectly,

of any judgment, award, decree, or order against the Debtor, the Liquidating Debtor, the Estate,

or any property of the Debtor, the Liquidating Debtor, or the Estate, with respect to any such

Claim or Interest; (c) creating, perfecting or enforcing, directly or indirectly, any Lien or

encumbrance of any kind against the Debtor, the Liquidating Debtor, the Estate, or any property

of the Debtor, the Liquidating Debtor, or the Estate, with respect to any such Claim or Equity

Interest; (d) asserting, directly or indirectly, any setoff, right of subrogation, or recoupment of

any kind against any obligation due the Debtor, the Liquidating Debtor, the Estate, or any

property of the Debtor, the Liquidating Debtor, or the Estate, with respect to any such Claim or

Equity Interest; and (e) any act, in any manner, in any place whatsoever, that does not conform to

or comply with the provisions of the Plan with respect to such Claim or Interest.  Nothing

contained in this section shall prohibit the Holder of a timely-filed Proof of Claim from litigating

its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the

distribution provisions of this Plan, or enjoin or prohibit the interpretation or enforcement by the

Claimant of any of the obligations of the Debtor or the Liquidating Debtor under this Plan.

### 7.    Post-Confirmation Liability of Responsible Officer, Disbursing Agent, and Post-Confirmation Oversight Committee.

The Responsible Officer, the Disbursing Agent, and the Post-Confirmation

Oversight Committee and its members, and the consultants, agents, advisors, attorneys,

accountants, financial advisors, other representatives and the professionals engaged by the

foregoing (collectively, "Indemnified Parties") shall not be liable for any and all liabilities,

losses, damages, claims, causes of action, costs and expenses, including but not limited to

attorneys' fees arising out of or due to their actions or omissions, or consequences of such

actions or omissions, to the Holders of Claims or Equity Interests for any action or inaction taken

in good faith in connection with the performance or discharge of his or her duties under this Plan,

except the Indemnified Parties will be liable for actions or inactions that are grossly negligent or

which constitute willful misconduct. However, any act or omission taken with the approval of

the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to

constitute gross negligence or willful misconduct. In addition, the Liquidating Debtor and the

Estate shall, to the fullest extent permitted by the laws of the State of Delaware, indemnify and

hold harmless the Indemnified Parties from and against and with respect to any and all liabilities,

losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising

out of or due to their actions or omissions, or consequences of such actions or omissions, with

respect to the Liquidating Debtor and the Estate or the implementation or administration of the

Plan if the Indemnified Party acted in good faith and in a manner reasonably believed to be in or

not opposed to the best interest of the Liquidating Debtor and the Estate. To the extent the

Liquidating Debtor indemnifies and holds harmless the Indemnified Parties as provided above,

the legal fees and related costs incurred by counsel to the Responsible Officer in monitoring and

participating in the defense of such claims giving rise to the right of indemnification shall be paid

as Plan Expenses. All rights of the Persons exculpated and indemnified pursuant hereto shall

survive confirmation of the Plan.

8. **Insurance.**

On or after the Effective Date, (i) the Responsible Officer and the Disbursing

Agent shall obtain a fidelity bond or similar insurance. In addition, the Responsible Officer may

obtain (if available) directors' and officers' liability insurance or errors and omission insurance

(or equivalent insurance), provided that such insurance is available at a reasonable price. The

cost of any fidelity bond or insurance obtained under Section 8(H) of the Plan shall be a Plan

Expense.

## VI.
## DISTRIBUTIONS TO HOLDERS OF SECURED CLAIMS

The Plan creates two (2) Classes of Allowed Secured Claims: Class 2(A) (Claims

Secured by Liens on Purchased Assets); and Class 2(B) (Claims Secured by Liens on Excluded

Assets). The Debtor estimates that the principal amounts of the prepetition claims in the Classes

of Secured Claims are as follows: Class 2(A) – approximately $0; and Class 2(B) –

approximately $0.

## VII.
## DISTRIBUTIONS TO HOLDERS OF UNSECURED CLAIMS

The Plan creates four (4) Classes of Allowed Unsecured Claims: Class 1 (Priority

Claims); Class 3 (Convenience Claims); Class 4 (Reclamation Claims (Settled)); and Class 5

(Unsecured Claims).[29] The Debtor estimates that the amounts of the prepetition claims in these

Classes are as follows: Class 1 – approximately $135,000[30]; Class 3 – approximately

---

29   Unsecured Claims include any Reclamation Claim that is not a Reclamation Claim (Settled), provided that
     such Reclamation Claim shall only be paid if and to the extent such Claim is an Allowed Claim.

30   This estimate of Class 1 Claims does not include Priority Tax Claims, which amount to approximately
     $1,585,000 and which are unclassified under the Plan.

$744,000^{31}$; Class 4 – approximately $563,000; and Class 5 – approximately $40,305,000

(exclusive of potential claims arising from the Debtor's rejection of executory contracts or

unexpired leases).

**VIII.**
**NO DISTRIBUTIONS TO HOLDERS OF**
**SUBORDINATED CLAIMS AND EQUITY INTERESTS**

The Plan classifies Subordinated Claims in Class 6 and Equity Interests in Class

7. There will be no distributions of any kind to the Holders of Class 6 Subordinated Claims and

the Holders of Class 7 Equity Interests. In addition, each Equity Interest in the Debtor shall be

deemed cancelled on the Effective Date.

**IX.**
**KEY PLAN PROVISIONS**

**A.    SOURCE OF PLAN FUNDING**

The Plan will be Funded by the "Plan Proceeds" which shall consist of:

**1.    Purchase Price and Available Cash.**

When the Sale closed, the Debtor received net cash proceeds in the amount of

approximately $23,200,000 paid by the Purchaser to the Debtor to purchase substantially all of

the Debtor's assets pursuant to the Sale Order and Purchase Agreement. In addition to the

foregoing net cash proceeds, the Debtor had Cash on hand from merchandise sales that predated

the closing of the Sale. Since the date of the closing of the Sale, the net cash proceeds have been

reduced by: (i) any payments or distributions made prior to the Effective Date on account of

expenses of administration provided in the ordinary course of business or as permitted by any

---

31 The actual amount of Claims in Class 3 will depend on the amount of Claims held by Holders who elect to have
their Claims treated as a Convenience Class Claim.

order of the Bankruptcy Court; (ii) any payments or distributions made to the Holders of

Allowed Secured Claims who have a Lien on the Purchase Price based on an interest in the

Purchased Assets; and (iii) the payment of certain Prepetition obligations to employees. In

addition, subsequent to the closing of the Sale, the Debtor has sold miscellaneous computer

equipment that has provided additional cash of $300,000. On the Effective Date, the Debtor

estimates that such net cash proceeds shall be approximately $21,850,000.

      2.    **Liquidation Proceeds.**

Liquidation Proceeds will consist of the Cash, or other consideration, paid to or

realized by the Debtor or Liquidating Debtor, as applicable, upon the sale, transfer, assignment

or other disposition of Plan Assets.

      3.    **Litigation Recovery.**

The Litigation preserved by the Debtor for the Liquidating Debtor under the Plan

includes:

        (a).    Any Avoidance Actions;

        (b).    Any claims for the turnover of property of the Debtor or
                Liquidating Debtor;

        (c).    Any action for the recovery of property or payment of money that
                belongs to or can be asserted by the Debtor or Liquidating Debtor
                as applicable; and

        (d).    Equitable subordination actions against Creditors.[32]

---

[32] The Responsible Officer reserves the right, in consultation with the Post-Confirmation Oversight Committee, to
not pursue any Litigation if, in the opinion of the Responsible Officer, the cost and risk associated with
obtaining a recovery on such litigation is not in the best interest of the Liquidating Debtor.

## PROJECTED PLAN PROCEEDS

| | |
|---|---|
| **Purchase Price[33]** | $22,100,000 |
| **Liquidation Proceeds** | $   150,000 |
| **Litigation Recovery** | **Unknown** |
| **TOTAL** | $22,250,000 |

4.    **New Common Stock**

In addition to the foregoing, the Plan Proceeds shall also include the proceeds, if

any, received from the disposition of the New Common Stock. Pursuant to the Plan, on or as

soon as practicable after the Effective Date the New Common Stock shall be issued by the

Liquidating Debtor to the Post-Confirmation Oversight Committee to be held on behalf of and as

the representative of all Holders of Allowed Claims. Each Holder of an Allowed Claim shall be

deemed to hold an undivided beneficial Pro Rata interest in the New Common Stock based upon

the priority and Allowed amount of such Holder's Claim. The New Common Stock shall be

treated as a Plan Asset and any proceeds of the New Common Stock shall be distributed as Plan

Proceeds to the Holders of Allowed Claims in accordance with the distributive provisions of this

Plan. At this time, the value, if any, of the New Common Stock cannot be ascertained.

However, such value, if any, shall be distributed as provided above and in the Plan.

**B.    MANAGEMENT OF LIQUIDATING DEBTOR**

The Liquidating Debtor will be managed and governed by the Responsible

Officer. The Plan designates Charles F. Kuoni III of Corporate Revitalization Partners, LLC as

---

33  Less amounts previously paid on account of administrative claims, but including any amounts to be paid to the
Holders of Allowed Secured Claims based upon a Lien on the Purchase Price.

the Responsible Officer. As noted above, Mr. Kuoni was also the Debtor's Chief Restructuring

Officer during the Debtor's Chapter 11 Case. Compensation arrangements with the Responsible

Officer shall be subject to approval by the Post-Confirmation Oversight Committee, unless

earlier approved by the Committee.

## C.   ADMINISTRATIVE CLAIMS

The Plan contemplates that Administrative Claims shall be paid in full by the

Debtor. The Bankruptcy Court shall set a bar date for the filing of Administrative Claims against

the Estate, which may be encompassed in the Confirmation Order.

## D.   PRIORITY TAX CLAIMS

The Debtor anticipates that the Estate will be obligated to satisfy certain tax

claims entitled to priority under section 507(a)(8) of the Bankruptcy Code. The Debtor estimates

that Priority Tax Claims in this case will total approximately $1,585,000. All Allowed Priority

Tax Claims shall be paid in full under the Plan.

## E.   PROFESSIONAL FEE CLAIMS

### 1.   Services By and Fees of Professionals Prior to the Effective Date.

The Plan provides that fees and expenses for the Professionals for services

rendered and costs incurred after the Petition Date and prior to the Effective Date will be paid by

the Debtor or the Liquidating Debtor following approval by the Bankruptcy Court after notice

and a hearing. The following chart is an estimate of the total professional fees for the

Professionals involved in this case as of August 22, 2006.[34]

---

34  It is anticipated that a portion of such fees will be paid prior to the Effective Date in accordance with interim fee
procedures approved by the Bankruptcy Court in the case.

| NAME | ROLE | TOTAL FEES INCURRED | TOTAL EXPENSES INCURRED | TREATMENT UNDER PLAN |
|---|---|---|---|---|
| Pachulski Stang Ziehl Young Jones & Weintraub LLP | Debtor's general bankruptcy counsel | $836,320 | $115,839 | Payment in full |
| Corporate Revitalization Partners | Chief Restructuring Officer and Crisis Manager | $1,002,891 | $ 48,383 | Payment in full |
| Davis & Gilbert, LLP | Debtor's special corporate counsel | $100,000 | $   0 | Payment in full |
| Financo, Inc. | Debtor's investment banker | $500,000. | $  3,291 | Payment in full |
| Bankruptcy Services, LLC | Claims Agent | $70,885 | $ 63,823 | Payment in full |
| Otterbourg, Steindler, Houston & Rosen, P.C. | Committee's general bankruptcy counsel | $668,117 | $ 10,055 | Payment in full |
| Jaspan Schlessinger Hoffman, LLP | Committee's conflict counsel | $ 13,848 | $    263 | Payment in full |
| Mahoney Cohen & Company, CPA, P.C. | Committee's financial advisors | $446,571 | $  3,975 | Payment in full |
| Abacus Advisors Group LLC | Committee's business consultant / sale advisor | $150,000 | $    239 | Payment in full |

## 2.    Services by Professionals and Certain Parties After the Effective Date

The Plan provides that fees for services rendered and costs incurred on and after

the Effective Date by the Responsible Officer or by the Responsible Officer's Professionals to

assist in the implementation of the Plan will be paid out of the Plan Proceeds.   The Liquidating

Debtor will likely need assistance from legal counsel to, among other things, analyze Claims and

potential Litigation, and handle the sale, liquidation, or collection of the Plan Assets.   The

Liquidating Debtor will also likely require assistance from tax professionals to file final tax

returns.   In addition, the Liquidating Debtor may require administrative or clerical assistance in

tracking claims, accounting, document and file management and correspondence.   Because

Bankruptcy Court review of the fees and expenses of Professionals will entail additional costs,

and thereby reduce distributions to Creditors, the Plan provides that all fees and expenses of the

Responsible Officer and the Responsible Officer's Professionals in implementing the Plan and

making distributions under the Plan may be paid without further notice to Creditors or approval

of the Bankruptcy Court.[35]  However, no compensation to Professionals shall be paid by the

Liquidating Debtor until after fifteen days written notice by the Liquidating Debtor to the Post-

Confirmation Oversight Committee.  If the Liquidating Debtor or the Post-Confirmation

Oversight Committee objects in writing to the payment of any compensation, such disputed

amount shall not be paid prior to the earlier of the resolution of such dispute or a ruling by the

Bankruptcy Court.

## X.
## OTHER CRITICAL INFORMATION REGARDING THE PLAN

### A.    AVOIDANCE ACTIONS

The Debtor has not yet fully analyzed the preference and fraudulent transfer

claims (i.e., Avoidance Actions) that the Estate may have against third parties and has not

commenced any actions against potential transferees.  As explained in greater detail in Article V,

Section E.3, above, at the urging of the Committee, the Debtor may not aggressively pursue

certain Avoidance Actions such as preferences because the cost-benefit analysis for particular

actions indicates there may be little benefit to the Estate in circumstances where there are

possible credible defenses to the action and the expected dividend to Creditors is relatively high

---

[35] The Confirmation Order shall advise creditors and other parties in interest of the right to deliver a written request
to the Liquidating Debtor for notice of any post-Confirmation applications by the post-Confirmation
professionals seeking approval of post-Confirmation fees and expenses.  Any disputes concerning the payment
of Plan Expenses shall be submitted to the Bankruptcy Court for resolution.

as compared to the cost of litigation and the value of the resulting Claim by the potential

judgment debtor under Bankruptcy Code section 502(h) for the avoided transfer. Nevertheless,

the fact that the Debtor has not commenced actions prior to the Effective Date of the Plan should

in no way imply that it is waiving its rights to bring such actions.

The Debtor expressly reserves the right to seek to avoid any transfer, including

those listed in any Plan Supplement that the Debtor may file prior to the Confirmation Hearing,

made within ninety (90) days of the Petition Date and one (1) year of the Petition Date (as to

Insiders) or such longer periods as may be available under applicable non-bankruptcy law. The

Debtor intends to prosecute only those Avoidance Actions that are cost effective or otherwise

can be raised as a valid defense to the allowance of a Claim pursuant to Bankruptcy Code section

502(d).

**B.    TAX IMPLICATIONS**

The United States federal income tax consequences of the distributions

contemplated by the Plan to the Holders of Claims that are United States Persons will depend

upon a number of factors. For purposes of the following discussion, a "United States Person" is

any person or entity (1) who is a citizen or resident of the United States, (2) that is a corporation

or partnership created or organized in or under the laws of the United States or any state thereof,

(3) that is an estate, the income of which is subject to United States federal income taxation

regardless of its source or (4) that is a trust (a) the administration over which a United States

person can exercise primary supervision and all of the substantial decisions of which one or more

United States persons have the authority to control; or (b) that has elected to continue to be

treated as a United States Person for United States federal income tax purposes. In the case of a

partnership, the tax treatment of its partners will depend on the status of the partner and the activities of the partnership. United States Persons who are partners in a partnership should consult their tax advisors. A "Non-United States Person" is any person or entity that is not a United States Person. For purposes of the following discussion and unless otherwise noted below, the term "Holder" shall mean a holder of a Claim that is a United States Person.

The United States federal income tax consequences to Holders and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby will depend upon, among other things, (1) the manner in which a Holder acquired a Claim; (2) the length of time the Claim has been held; (3) whether the Claim was acquired at a discount; (4) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (5) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (6) the method of tax accounting of the Holder; and (7) whether the Claim is an installment obligation for United States federal income tax purposes. Certain holders of Claims (such as foreign persons, S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers and tax-exempt organizations) may be subject to special rules not addressed in this summary of United States federal income tax consequences. There also may be state, local, and/or foreign income or other tax considerations or United States federal estate and gift tax considerations applicable to holders of Claims, which are not addressed herein. EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR WITH RESPECT TO DISTRIBUTIONS RECEIVED UNDER THE PLAN.

1.    **Holders of Claims.**

A Holder who received Cash (or potentially other consideration with respect to

Holders of Class 2(B) Claims) in satisfaction of its Claims may recognize ordinary income or

loss to the extent that any portion of such consideration is characterized as accrued interest.  A

Holder who did not previously include in income accrued but unpaid interest attributable to its

Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be

treated as having received interest income to the extent that any consideration received is

characterized for United States federal income tax purposes as interest, regardless of whether

such Holder realizes an overall gain or loss as a result of surrendering its Claim.  A Holder who

previously included in its income accrued but unpaid interest attributable to its Claim should

recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied,

regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it

may receive under the Plan on account of its Claim.

2.    **Holders of Class 7 Equity Interests.**

Pursuant to the Plan, all Class 7 Equity Interests will be cancelled, annulled and

extinguished, and Holders of Class 7 Equity Interests will receive nothing in exchange for such

Equity Interests.  As a result, each Holder of a Class 7 Equity Interest generally should recognize

a loss equal to the Holder's tax basis in its Class 7 Equity Interest extinguished under the Plan

unless the Holder previously claimed a loss with respect to such Equity Interests under its regular

method of accounting.  In general, if the Holder held its Class 7 Equity Interest as a capital asset,

the loss will be treated as a loss from the sale or exchange of such capital asset.  Capital loss will

be long-term if the Class 7 Equity Interest was held by the Holder for more than one year and

otherwise will be short-term. Any capital losses realized generally may be used by a corporate

Holder only to offset capital gains, and by an individual Holder only to the extent of capital gains

plus $3,000 of other income.

### 3.    Non-United States Persons.

A holder of a Claim that is a Non-United States Person generally will not be

subject to United States federal income tax with respect to property (including money) received

in exchange for such Claim pursuant to the Plan, unless (i) such holder is engaged in a trade or

business in the United States to which income, gain or loss from the exchange is "effective

connected" for United States federal income tax purposes, or (ii) if such holder is an individual,

such holder is present in the United States for 183 days or more during the taxable year of the

exchange and certain other requirements are met.

### 4.    Importance of Obtaining Professional Tax Assistance.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY

OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A

SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE

ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX

ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY

VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES.

ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS

ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE

FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## C.    RISKS UNDER THE PLAN

The Debtor submits that there are no material risks to implementation of the Plan,

since the majority of the Debtor's assets have already been reduced to Available Cash through

the Sale, which closed on February 17, 2006.

## D.    LIQUIDATION ANALYSIS

Pursuant to section 1129(a)(7) of the Bankruptcy Code, unless there is unanimous

acceptance of the Plan by an impaired Class, the Debtor must demonstrate, and the Bankruptcy

Court must determine that with respect to such Class, each holder of a Claim will receive

property of a value, as of the Effective Date of the Plan, that is not less than the amount that such

holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on

the Effective Date of the Plan. This requirement is commonly referred to as the "Best Interests

of Creditors Test." For the reasons set forth below, the Debtor believes that the Plan satisfies the

Best Interests of Creditors Test.

In a chapter 7 liquidation, Holders of Allowed Claims would receive distributions

based on the liquidation of the assets of the Debtor. Such assets would include the same assets

being collected and liquidated under the Plan -- ie. the Purchase Price from the Sale, Liquidation

Proceeds, and Litigation Recoveries, except for the New Common Stock.[36]    However, the net

proceeds from the collection, sale and or liquidation of property of the Estate available for

distribution to Creditors would be reduced by the commission payable to the chapter 7 trustee

and the trustee's attorney's and accounting fees, as well as the administrative costs incurred

during the Chapter 11 Case (such as the compensation for chapter 11 Professionals). The Debtor

---

36    A chapter 7 trustee would not be able to issue the New Common Stock.

has already reduced the vast majority of its assets to Available Cash through the Sale. Therefore, the Estate has already absorbed the cost of operating the Debtor's business to realize upon these and other assets.

In chapter 7 cases, the chapter 7 trustee would be entitled to seek a sliding scale commission based upon the amount of funds distributed by such trustee, even though the Debtor has already accumulated the majority of such funds and has incurred the expenses associated with generating those funds. Accordingly, there is a strong likelihood that Creditors would "pay again" for the funds already accumulated by the Debtor, because the chapter 7 trustee would be entitled to receive a commission in some amount for all funds distributed, including the Purchase Price. It is also anticipated that a chapter 7 liquidation would result in delay in the distributions to Creditors. Among other things, a chapter 7 case would trigger a new bar date for filing Claims that would be more than 90 days following conversion of the Chapter 11 Case to chapter 7. *Fed. R. Bankr. P. 3002(c)*. Hence, a chapter 7 liquidation would not only cost more in the way of administrative fees and delay distributions, but also raise the prospect of the allowance of additional Claims that were not timely asserted in the Chapter 11 Case. Based on the foregoing, the Debtor submits that the Plan provides the best opportunity to bring the greatest return to Creditors.

In addition, the Debtor is doubtful that a chapter 7 trustee would pursue the Estate's Litigation as vigorously as the Liquidating Debtor, or be able to identify those Claims that are cost-effective to pursue as prudently as the Liquidating Debtor, who would have the benefit of the knowledge and information possessed by certain of the Debtor' Professionals.

In addition, the Debtor and its Professionals have acquired knowledge of the Estate and the Claims against it that cannot be easily duplicated by a chapter 7 trustee in a cost-effective manner.  The Debtor believes that, if the Plan is not confirmed, the most likely alternative will be conversion of the Chapter 11 Case to a chapter 7 liquidation.  The Debtor believes that the Plan is more likely to yield economic benefits to Unsecured Creditors than a chapter 7 liquidation, because it will avoid a layer of administrative expense associated with the appointment of a chapter 7 trustee, while maximizing the efficiency of administrating the Debtor's remaining assets for the benefit of all Creditors.

Lastly, the Plan meets the Best Interests of Creditors Test for the holders of Allowed Claims in Class 6 (Subordinated Claims).  Bankruptcy Code section 726(a)(4) subordinates Claims for penalties, forfeitures, and punitive damages, and similar Claims that do not compensate the Holder for actual pecuniary loss, to the Claims of Creditors for pecuniary loss, including tardy Claims for pecuniary loss.  Under the Plan, Holders of Claims in Class 6 will be paid nothing because the Debtor is insolvent and cannot pay its Unsecured Claims in full.  Thus, subordination of Class 6 Claims under the Plan is the same treatment the Holders of such Claims would receive in a chapter 7 case.

## XI.
## CONFIRMATION OF THE PLAN

The Debtor will seek confirmation of the Plan at the Confirmation Hearing, pursuant to applicable provisions of the Bankruptcy Code.

A.    **CONFIRMATION HEARING**

The Bankruptcy Court will hold the Confirmation Hearing on _____,

**2006, at** _____. to determine whether the Plan has been accepted by the requisite number

of Creditors and whether the other requirements for Confirmation of the Plan have been satisfied.

For a detailed description of Confirmation, the Confirmation Hearing and how to object to

Confirmation, see Articles 2(D) – (F).

B.    **REQUIREMENTS FOR CONFIRMATION**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the

provisions of section 1129 of the Bankruptcy Code have been satisfied.   If all of the provisions

of section 1129 of the Bankruptcy Code are met, the Bankruptcy Court may enter an order

confirming the Plan.  The Debtor believes that all of the requirements of section 1129 of the

Bankruptcy Code will be satisfied.  Among other things, the Debtor believes that the Plan will be

accepted by the requisite number of votes and satisfies all of the statutory requirements of

chapter 11 of the Bankruptcy Code.  The Debtor submits that it has complied or will have

complied with all of the requirements of chapter 11, and that the Plan has been proposed and is

made in good faith.  In addition, the Debtor submits that the Plan satisfies the "best interest" of

Creditors and will is not be followed by the need for further bankruptcy relief.

C.    **CLASSIFICATION OF CLAIMS AND INTERESTS**

The Bankruptcy Code requires that a plan under chapter 11 place each creditor's

claim and each equity interest in a class with other claims or interests that are "substantially

similar."  The Plan establishes seven (7) Classes of Claims and one (1) Class of Equity Interests.

Under the Plan, Claims which are secured or entitled to priority are placed in separate Classes

from Unsecured Claims. For a detailed description of the Classes of Claims and Equity Interests

under the Plan, see Article IV.

The Debtor believes that the Plan's classification of Claims and Equity Interests fully

complies with the requirements of the Bankruptcy Code.

**D.     ACCEPTANCE**

As a condition to Confirmation, the Bankruptcy Code requires that each class of

holders of claims or interests accept the plan, with the exceptions described below. The

Bankruptcy Code defines acceptance by a class of holders of claims as acceptance by holders of

two-thirds in dollar amount and a majority in number of claims of that class, but for this purpose

counts only those who actually vote to accept or reject the plan. Holders of claims who fail to

vote are not counted as either accepting or rejecting the plan.

Classes of claims and interest that are not "impaired" under a plan are deemed to

have accepted the plan. A class is generally "impaired" if the legal, equitable, or contractual

rights attaching to the claims or interests of that class are modified, other than by curing defaults

and reinstating maturities or by payment in full in cash. A class that receives nothing under a

plan is deemed to reject such plan.

IN THIS CASE, THE FOLLOWING CLASSES ARE IMPAIRED UNDER THE

PLAN: CLASSES 1, 2(A), 2(B), 3, 4, 5, 6 AND 7. CLASSES 6 AND 7 ARE NOT ENTITLED

TO VOTE ON THE PLAN AND ARE DEEMED TO REJECT THE PLAN.

**E.     BEST INTERESTS OF CREDITORS**

The Debtor believes that confirmation of the Plan is in the best interests of the

Holders of Claims, because it provides to holders of Impaired Claims distributions having a

present value as of the Effective Date of not less than the value such holders would likely receive

if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

As to Class 6 (Subordinated Claims), under the Plan, the Holders of Allowed

Claims in Class 6 will receive at least as much as such Holders would receive in a chapter 7 case.

In particular, pursuant to Bankruptcy Code section 726(a)(4), Claims for forfeitures, penalties,

and punitive damages, and similar Claims that do not compensate for actual pecuniary loss, are

treated differently than Claims for pecuniary loss, including tardy Claims for pecuniary loss.

Thus, classifying and treating such Subordinated Claims as they are treated in chapter 7 satisfies

Bankruptcy Code sections 1122 and 1129 (a)(7).

In sum, as reflected by the Debtor's Liquidation Analysis above, the Debtor

believes that the Holders of Claims and Equity Interests will realize greater value under the Plan

than they would in a chapter 7 liquidation primarily because of the additional administrative

costs and fees that would be incurred were the case to convert to chapter 7.  As explained in the

Liquidation Analysis, the Debtor's Creditors would essentially be forced to "pay again" for the

funds accumulated by the Debtor because the chapter 7 trustee would be entitled to receive a

commission in some amount for all funds distributed.  Since the Debtor has already converted

the majority of the Debtor's assets into Available Cash, by way of the Sale, and already incurred

the costs and expenses for same, it simply makes no sense to have additional costs incurred by

creditors for a chapter 7 trustee to merely distribute such funds.  In addition, pursuant to the Plan,

the Holders of Allowed Claims will also receive the value (if any) generated by the issuance and

disposition of the New Common Stock, which would not be available under a chapter 7

liquidation. Consequently, the Debtor believes that the Plan is in the best interests of the Holders
of Claims and Equity Interests in this case.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the
Holders of Claims and Equity Interests in any Impaired Class that has not voted to accept the
Plan would receive a distribution under the Plan that is at least as great as the distribution that
such Holders would receive upon a liquidation of the Debtor pursuant to chapter 7 of the
Bankruptcy Code.

## F.    FEASIBILITY

Section 1129(a)(11) of the Bankruptcy Code requires a finding that confirmation
of the Plan is not likely to be followed by the liquidation, or the need for further reorganization,
of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or
reorganization is proposed in the Plan.

The Plan proposed by the Debtor satisfies these requirements and is "feasible"
because the implementation of the Plan and the wind-up of the Debtor's affairs pursuant thereto
will be funded by the proceeds from the Sale. Since the Sale had closed and the Debtor is in
receipt of the Purchase Price, distributions to Creditors under the Plan will occur and are not
dependent upon any ongoing operations by the Debtor.

In particular, the Plan provides that all Cash will be accumulated by the Debtor or
Liquidating Debtor, as applicable, and held as Plan Proceeds for distribution to the Holders of
Allowed Claims in the order of priority. Thus, the Plan contemplates distribution of the Net Plan
Proceeds as a waterfall, with the senior claims paid ahead of junior claims. Because
substantially all of the Debtor's assets have already been reduced to Cash, the Debtor knows it

has sufficient Cash, and hence sufficient Net Plan Proceeds to pay all Administrative Claims, Priority Tax Claims, Priority Claims and Secured Claims in full, and to distribute the balance to the Holders of Allowed Unsecured Claims.

Therefore, the Debtor believes that Confirmation of the Plan is not likely to be followed by the need for a further bankruptcy relief by the Liquidating Debtor.

## G.    CRAMDOWN

A court may Confirm a plan, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that the court find that a plan is "fair and equitable" and does not "discriminate unfairly" with respect to each nonaccepting impaired class of unsecured claims or interests. With respect to a dissenting class of unsecured claims, the "fair and equitable" standard requires, among other things, that a plan contain one of two elements. It must provide either that each holder of an unsecured claim in such class receive or retain property having a value, as of the effective date of a plan, equal to the allowed amount of its claim, or that no holder of allowed claims or interests in any junior class receive or retain any property on account of such claims or interests. With respect to a dissenting class of interests, the "fair and equitable" standard requires that the plan contain one of two elements. It must provide either (i) that each holder of an interest in the class receive or retain property having a value, as of the Effective Date, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, or the value of such interests, or (ii) that no holder of an interest in any junior class receive or retain any property on account of such interests. The strict

requirement of the allocation of full value to dissenting classes before junior classes can receive

a distribution is known as the "absolute priority rule."

In the event that any impaired Class shall fail to accept the Plan in accordance

with section 1129(a)(8) of the Bankruptcy Code, the Debtor reserves the right to request that the

Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code

or modify the Plan in accordance with the terms thereof.

## H.    ALTERNATIVES TO CONFIRMATION OF PLAN

If the Plan is not Confirmed by the Bankruptcy Court and consummated, the

alternatives include (i) liquidation of the Debtor under chapter 7 of the Bankruptcy Code; or

(ii) confirmation of an alternative plan of liquidation under chapter 11 of the Bankruptcy Code.

If the Plan is not confirmed, the Debtor will decide which alternative to pursue by

weighing its available options and choosing the alternative that is in the best interest of the

Debtor, it's Creditors and other parties in interest.  However, the Debtor believes that the Plan, as

proposed, provides the greatest possible return available for the Holders of Claims in this

Chapter 11 Case.

## XII.
## CONCLUSION

The Debtor believes that the Plan is in the best interest of Creditors and urge

Creditors to vote to accept the Plan.

Dated: September __, 2006

Charles F. Kuoni III
Chief Restructuring Officer
G+G Retail, Inc., Debtor and Debtor in Possession

Submitted by:

PACHULSKI STANG ZIEHL YOUNG
JONES & WEINTRAUB LLP

Laura Davis Jones (DE Bar No. 2436)
William P. Weintraub (SDNY 2897)
David M. Bertenthal (CA Bar No. 167624)
Curtis A. Hehn (DE Bar No. 4264)
780 Third Avenue, 36th Floor
New York, NY 10017-2024
Telephone: (212) 561-7700
Facsimile: (212) 561-7777

Counsel to Debtor and Debtor in Possession

123