UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                              :
In re:                                                        :    Chapter 11
                                                              :
G+G RETAIL, INC.,                                             :    Case No. 06-10152(RDD)
                                                              :
                        Debtor.                               :
-------------------------------------------------------------x

# MEMORANDUM OF DECISION ON MOTION
# TO ENFORCE SALE ORDER

Appearances:

    Gibson, Dunn & Crutcher LLP, by Janet M. Weiss, Esq., for Max
    Rave, LLC

    Pachulski Stang Ziehl & Jones LLP, by Robert J. Feinstein, Esq. and Beth
    E. Levine, Esq., for the Debtor

    Otterbourg, Steinder, Houston & Rosen, P.C., by Scott L. Hazan, Esq. and
    Steven B. Soll, Esq., for the Post-Confirmation Oversight Committee

Hon. Robert D. Drain, United States Bankruptcy Judge

By order dated February 17, 2006 (the "Sale Order"), this Court approved the sale of substantially all of the assets of the above debtor, G+G Retail, Inc. (the "Debtor") to Max Rave, LLC ("Max Rave") pursuant to an Asset Purchase Agreement dated as of February 13, 2006 (the "APA"). By motion dated July 22, 2009, Max Rave sought an order enforcing the Sale Order and the APA; more specifically, Max Rave sought an order (i) declaring that under the APA it purchased the Debtor's rights in respect of the settlement of an antitrust class action, and (ii) directing that Max Rave or its designee be paid the settlement proceeds. The Debtor and the Debtor's post-confirmation oversight committee (the "Committee") objected to Max Rave's motion,

1

contending that, properly read, the APA excludes the Debtor's rights under the class action and the class action settlement from the assets purchased by Max Rave.

This memorandum of decision states the Court's reasons for concluding that the APA treats the settlement as a purchased asset to the extent that it relates to the Debtor's store locations purchased by Max Rave but not to the extent that it relates to the Debtor's store locations not purchased by Max Rave.

## **Jurisdiction**

This Court has core jurisdiction under 28 U.S.C. §§ 157(b)(1) and (b)(2)(N) and (O) and 1334(a) to interpret and enforce the Sale Order. Travelers Indem. Co. v. Bailey, 129 S.Ct. 2195, 2205 (2009); Jamaica Shipping Co. Ltd. v. Orient Shipping Rotterdam (In re Millennium Seacarriers, Inc.), 458 F.3d 92, 95 (2d Cir. 2006). This is so notwithstanding the confirmation and consummation of the Debtor's chapter 11 plan. Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.), 304 F.3d 223, 230 (2d Cir. 2002).[1]

The Debtor correctly observes that because Max Rave requests the determination of the validity and extent of an interest in property, Max Rave should have sought relief in an adversary proceeding. Fed. R. Bankr. P. 7001. However, the Debtor also notes that the dispute is essentially documentary, hinging on the plain meaning of the

---

[1] Both the Sale Order and the order confirming the Debtor's chapter 11 plan reserved the Court's jurisdiction to interpret and enforce the Sale Order and the APA, and this dispute over the primary transaction in the Debtor's chapter 11 case -- the APA -- has a close nexus to the plan (which was a liquidating chapter 11 plan premised upon the enforcement of the APA and the distribution of the sale proceeds) and the chapter 11 case. Krys v. Sugrue, 2008 U.S. Dist. LEXIS 86249 at *21-2 (S.D.N.Y. Oct. 23, 2008); Penthouse Media Group v. Guccione (In re Gen. Media, Inc.), 335 B.R. 66, 73-4 (Bankr. S.D.N.Y. 2005). See also Boston Regional Med. Ctr. v. Reynolds (In re Boston Regional Med. Ctr.), 410 F.3d 100, 106-07 (1st Cir. 2005) (bankruptcy court's post-confirmation jurisdiction in a liquidating chapter 11 case is greater than when the debtor has reorganized, because it "relates much more directly to a proceeding under title 11" and there is no risk of untoward, prolonged bankruptcy court supervision of an ongoing, reorganized business).

2

APA, and, therefore, accepts that it may be determined on a summary judgment basis under Fed. R. Bankr. P. 7056. The Court has thus deemed Max Rave's motion to be both an adversary complaint and a motion for summary judgment and the objections to it by the Debtor and the Committee to be cross-motions for summary judgment. See Adirondack Transit Lines, Inc. v. United Transportation Union, 305 F.2d 82, 84 (2d Cir. 2002) ("The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may be properly resolved by summary judgment."); Homemaker Indus., Inc. v. Official Comm. of Unsecured Creditors of HMKR, Inc., 2004 U.S. Dist. LEXIS 6682, at *10 (S.D.N.Y. Apr. 20, 2004).

## Background

The facts are generally undisputed. The Debtor was an apparel retailer, selling primarily women's clothing in 515 stores in the United States, Puerto Rico and the U.S. Virgin Islands. It filed for relief under chapter 11 on January 25, 2006 and, after an active pre- and postpetition marketing process, on February 17, 2006 obtained the Court's approval of its entry into the APA with Max Rave as the winning bidder. The transaction closed shortly thereafter. Although Max Rave bought substantially all of the Debtor's assets, including taking the assignment of most of the Debtor's store leases, it did not buy all of them. As discussed in more detail below, a number of store locations, as well as other assets and types of assets, were specifically excluded from the purchased assets under the APA.

In 1996, meanwhile, certain retailers and trade associations had filed a class action against Visa U.S.A. Inc. and MasterCard International Incorporated, alleging that the defendants, in conspiracy with each other and their member banks, had violated

3

and were violating federal antitrust laws by tying retailers' acceptance of credit cards to their acceptance of debit cards and forcing payment of excessive fees (the "Class Action"). The Class Action was settled by an agreement dated June 4, 2003, which received final approval from the court presiding over the Class Action on June 1, 2005.

The settlement agreement provided that class members who submitted timely claims would (i) be reimbursed for overcharges associated with their acceptance of Visa and MasterCard credit and signature debit transactions during the class period (which covers October 25, 1992 through June 21, 2003), (ii) receive payment for damages associated with their acceptance of PIN debit cards, and (iii) receive, pro rata, any remaining undistributed settlement funds. The Debtor, a member of the plaintiff class, submitted a claim under the settlement before the December 28, 2005 settlement bar date. It had hired a collection agent, Spectrum Settlement Recovery ("Spectrum") to manage this process. In January 2008, Spectrum sent the Debtor the first payment under the settlement, $218,102.58. In January 2009, Spectrum notified the Debtor that it would be receiving a second payment, $219,385.55, but Spectrum stopped that payment when informed by Max Rave of its claim under the APA to the settlement proceeds.

In response to the Court's request for supplemental pleadings after oral argument, Max Rave detailed how the payments under the settlement were calculated and provided a link to the Class Action settlement claims distribution website explaining the calculation methodology. See Supplemental Brief in Support of Motion of Max Rave, LLC to Enforce Sale Order, Exhibit A (comprising a printout of the website's methodology for calculating estimated cash payments). In short, the Claims

Administrator employs the following methodology to determine class members' settlement amounts:

> (i) identify or estimate the dollar volume of Visa/Master Card debit and credit purchases, and where applicable, the number or volume of on-line PIN debit purchases accepted by the Class Member; and (ii) convert those purchase volumes into an Estimated Cash Payment by applying an estimated per dollar or per transaction amount that is based on the amount Class Members were overcharged for credit and debit transactions as described in the Fisher Allocation Methodology [the damage calculation methodology developed by the class plaintiffs' expert to estimate the amount class members were damaged for each dollar of Visa and/or MasterCard debtor or credit transactions, and for each on-line debit transaction they accepted during the class period].

Id. at Section B., page 3; Section 1.J., page 1-2. These calculations are made at a location-by-location level, as shown by another section from the website, attached as Exhibit B to Max Rave's Supplemental Brief, which shows the results of the foregoing calculations based on transactions at each of the Debtor's stores during the class period.

On the Class Action settlement calculation issue, the Debtor states merely that Spectrum has advised "that it would be possible to create an estimated [per store] allocation but that such an estimate would be extremely time-consuming and complicated and would not be precise." Statement of the Liquidating Debtor in Further Support of its Opposition to Motion to Enforce Sale Order, page 7 n.4 ("Debtor's Supplemental Response"). Not only is this assertion wholly conclusory but also it is belied by the detailed methodology described above, not to mention that it raises the question of what Spectrum was doing to verify that the settlement fund payments, ostensibly calculated as quoted above, were made to the Debtor in the correct amounts. In sum, the Debtor's Supplemental Response raises no more than a proverbial metaphysical doubt over whether the Debtor's Class Action settlement payments are properly determined on a per store basis.

**Discussion**

Summary judgment is granted under Fed. R. Civ. P. 56, made applicable in this case by Fed. R. Bankr. P. 7056, when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To defeat a motion for summary judgment on the basis of a material factual dispute, there must be evidence on which a jury could reasonably find for the non-moving party; although the evidence need not be probative, there must be a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-49 (1986). Conclusory statements by the non-moving party do not suffice. Twin Laboratories, Inc. v. Weider Health Fitness, 900 F.2d 566, 568 (2d Cir. 1990). There must be more than some "metaphysical doubt as to the material facts." Matsushita v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

As noted above, an issue that depends on the unambiguous terms of a written agreement is particularly apt for resolution by summary judgment, being a question of law. Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 73 (2d Cir. 1989); see also Metropolitan Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990) (under New York law,[2] "[I]f a contract is unambiguous on its face, its proper construction is a question of law."). That is because "a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." Cruden v. Bank of New York, 957 F.2d

---

[2] Pursuant to APA § 12.8, the APA, which was negotiated at least in part in New York, "shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State without regard to such State's conflicts of laws rules which would require the application of the law of any other jurisdiction." No party disputes that New York law applies to this dispute. See Westinghouse Credit Corp. v. D'Urso, 278 F.3d 138, 146 n.3 (2d Cir. 2002); Cargill, Inc. v. Charles Kowsky Resources, Inc., 949 F.2d 51, 55 (2d Cir. 1991).

961, 976 (2d Cir. 1992), citing Breed v. Ins. Co. of North America, 46 N.Y.2d 351, 355 (1978); see also Beth Medrash Eeyun Hatalmud v. Spellings, 505 F.3d 139, 146 (2d Cir. 2007) ("[T]he best evidence of intent is the contract itself; if an agreement is complete, clear and unambiguous on its face, it must be enforced according to the plain meaning of its terms.").

Although urging the Court to adopt their respective interpretations of the APA, the parties do not contend that the APA is ambiguous, which is consistent with the proposition that "[l]anguage whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation." Metropolitan Life, 906 F.2d at 889. Rather, contractual provisions are ambiguous only if they are objectively susceptible without reference outside of the contract to more than one interpretation by a reasonably intelligent person. Krumme v. WestPoint Stevens, Inc., 238 F.3d 133, 139 (2d Cir. 2000) (applying New York law); Burger King v. Horn & Hardart Co., 893 F.2d 525, 527 (2d Cir. 1990) (same). Conversely, "[c]ontract language is unambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." Metropolitan Life, 906 F.2d at 889 (internal quotation and citation omitted); see also LTV Corp. v. AM Gen. Corp. (In re Chateaugay Corp.), 154 B.R. 843, 847 (Bankr. S.D.N.Y. 1993).

Relatedly, "a contract should be construed so as to give full meaning and effect to all of its provisions." PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1199 (2d Cir. 1996) (quoting American Express Bank Ltd. v. Uniroyal, Inc., 164 A.D.2d 275, 277, 562 N.Y.S.2d 613, 614 (1st Dep't 1990), appeal denied, 77 N.Y.2d 807 (1991)). Or, stated in

7

the negative, no provision of a contract should be left without force and effect. Manley v. AmBase Corp., 337 F.3d 237, 250 (2d Cir. 2002) (applying New York law); Laba v. Carey, 29 N.Y.2d 302, 308 (1971); Muzak Corp. v. Hotel Taft Corp., 1 N.Y.2d 42, 46 (1957); see also Homemaker Indus., Inc. v. Official Comm. of Unsecured Creditors of HMKR, Inc., 204 U.S. Dist. LEXIS 6682, at *15; Restatement (Second) of Contracts § 202(2). Relatedly, too, a specific provision in a contract generally will govern over a general provision to the extent it applies to the facts at issue. Paneccasio v. Unisource Worldwide, Inc., 532 F.3d 101, 111 (2d Cir. 2008); Muzak Corp. v. Hotel Taft Corp., 1 N.Y.2d at 46; see also Restatement (Second) of Contracts § 203(c).

Neither the Class Action nor the Class Action settlement is specifically identified in the APA as a "Purchased Asset" (although both existed before the parties entered into the APA). One must turn, then, to the APA's more general definitions of the "Purchased Assets" and the "Excluded Assets" to decide Max Rave's rights in the settlement proceeds.

APA § 2.1(b) states, "For all purposes of and under this Agreement, the term 'Purchased Assets' means those properties, assets and rights of Seller (other than the Excluded Assets) existing as of the Closing, real or personal, tangible or intangible, including:"[3] and then § 2.1(b) enumerates, in subsections (i) through (xix), a list of more narrowly defined types of assets included within the definition of "Purchased Assets." Making crystal clear the meaning of the general definition, APA § 2.1(b)(xx) then repeats that the "Purchased Assets" include "all other tangible or intangible assets not expressly identified as Excluded Assets."

---

[3] Under APA §1(a), "the word "including". . . means 'including without limitation' and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it."

8

Accordingly, before turning the reader to whether any of the categories specifically listed as "Purchased Assets" encompasses the Class Action settlement, the APA directs one to its definition of the "Excluded Assets." If nothing in that definition applies to the Class Action settlement, the settlement would, under APA §§ 2.1(b) and (b)(xx) be a "Purchased Asset," because, under those sections, anything not specifically denominated an "Excluded Asset" is a "Purchased Asset."

Unfortunately for Max Rave, however, two of the listed categories comprising APA § 2.2's definition of "Excluded Assets" are (i) "all Excluded Locations," APA § 2.2(j),[4] and (ii):

> <u>any rights, claims or causes of action of Seller against third parties</u> relating exclusively to the Excluded Assets or <u>not related to the Purchased Assets and arising out of events occurring prior to</u>, on or after <u>the Closing Date</u>, including without limitation any rights under or pursuant to all warranties, representations and guaranties made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to Seller and relating exclusively to the Excluded Assets.

APA § 2.2(f) (emphasis added). If Max Rave wants to rely on the general definition of "Purchased Assets" in APA §§ 2.1(b) and (b)(xx), its problem, then, is clear: while APA §§ 2.1(b) and (b)(xx) provide that anything that is not an "Excluded Asset" is a "Purchased Asset," APA § 2.2(f) defines the Debtor's pre-closing rights, claims or causes of action that are not related to the Purchased Assets as "Excluded Assets." This would appear to encompass rights, claims or causes of action relating to any of the other specific "Excluded Assets" categories listed in APA § 2.2, including causes of action relating, under APA § 2.2(j), to "all Excluded Locations."

---

[4] "Excluded Locations" are defined as any "Store, Clearance Center, Warehouse or other place at which the Seller operates the Business" that is subject to an Excluded Lease, i.e.: a Lease designated by the Max Rave as not included within the acquisition. APA § 1.1, pages 5, 7.

9

Max Rave argues, however, that one of the enumerated categories of "Purchased Assets" -- described in APA § 2.1(b)(xi) -- pertains more specifically to the Class Action and its settlement than APA §§ 2.2(f) and (j).[5] If this were so, Max Rave would be entitled to all of the settlement proceeds. It is not so, however.

APA § 2.1(b)(xi) provides that the following are specifically included within the definition of the "Purchased Assets":

> <u>Any rights, claims or causes of action of Seller against third parties relating to the Purchased Assets, the operation of the Business in respect of the Purchased Leases and the purchase and sale of Inventory, in each case whether arising out of events occurring prior to, on or after the Closing Date</u>, including without limitation any rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, vendors and contractors t the extent relating to products sold, or services provided, to Seller and relating to the Purchased Assets, the Purchased Leases and Inventory, other than Avoidance Actions and causes of action relating exclusively to Excluded Assets.

APA § 2.1(b)(xi) (emphasis added). Based on the foregoing language, Max Rave argues that any right, claim or cause of action of the Debtor against a third party "relating to the Purchased Assets" is also a "Purchased Asset" as long as it does not relate "exclusively" to an "Excluded Asset." From that position, it argues that, given the broad definition of "relating to," see <u>Coregis Ins. Co. v. Am. Health Found., Inc.</u>, 241 F.3d 123, 128-29 (2d Cir. 2001); <u>In re TL Administration Corp.</u>, 337 B.R. 827, 834 (Bankr. S.D.N.Y.2006), all of the Debtor's rights under the Class Action and its settlement must relate to some "Purchased Asset" and, therefore, now belongs to Max Rave.

---

[5] Max Rave also argues that APA § 2.1(b)(i), which lists "amounts due pursuant to credit card and bank card purchases," as "Purchased Assets" also applies to the Debtor's rights under the Class Action and Class Action settlement. However, it is clear that this provision, which is preceded by a clause covering current cash and cash equivalents, pertains to amounts currently due on credit card receipts, not tort claims based upon anti-trust violations by credit and debit card issuers occurring several years previously. The parties knew how to describe "rights, claims and causes of action against third parties," as evidenced by APA §§ 2.1(b)(xi) and 2.2(f). APA § 2.1(b)(1) should not be read, therefore, also to cover such rights and claims.

10

To the contrary, however, one must read the underlined provision of APA § 2.1(b)(xi) as a conjunctive series: "Any rights, claims or causes of action of Seller against third parties relating to the Purchased Assets, the operation of the Business in respect of the Purchased Leases and the purchase and sale of Inventory." That is, to be a "Purchased Asset" within this specific category of "Purchased Assets," the right, claim or cause of action must relate to each of the listed criteria; if the cause of action does not relate to any one of them, it is not covered by this specific provision (although it may fall into the catch-all category of "Purchased Assets" if it is not listed among the "Excluded Assets"). Max Rave, instead, would re-write the phrase as "Any rights, claims or causes of action of Seller against third parties relating to <u>any of</u> the Purchased Assets, the operation of the Business in respect of the Purchased Leases <u>or</u> the purchase and sale of Inventory." In addition to altering the provision's language, if APA § 2.1(b)(xi) were to be so read, another clause in the section would be rendered superfluous. That is, "Inventory" is a "Purchased Asset" under APA §§ 1.1 and 2.1(b)(iii); under Max Rave's interpretation, therefore, "Inventory" should not need to be referenced in APA § 2.1(b)(xi) because it would be subsumed in the category of "Purchased Assets." Such a reading is not preferred. <u>Laba v. Carey</u>, 29 N.Y.2d at 308; <u>Muzak Corp. v. Hotel Taft Corp.</u>, 1 N.Y.2d at 46. Thus, it appears that no specific provision of the APA trumps APA §§ 2.2(f) and (j)'s exclusion from the "Purchased Assets" of the Debtor's rights under the Class Action and the settlement in respect of causes of action against third parties related to the "Excluded Locations."

It should be noted that the Debtor and the Committee would not limit the effect of APA § 2.2 on Max Rave's rights to the Class Action settlement to the store

11

locations that Max Rave did not purchase. They argue, instead, that APA § 2.2(f) operates <u>on its own</u> to exclude the Class Action and the settlement thereof from the "Purchased Assets" as long as the Debtor's rights and claims therein were not specifically included among the "Purchased Assets" categories. Then they argue -- correctly, as discussed above -- that APA § 2.1(b)(xi) does not specifically provide for the inclusion of the Class Action and the settlement among the "Purchased Assets." However, the Debtor and the Committee's interpretation ignores the sweeping nature of the parties' definition of the "Purchased Assets" in APA §§ 2.1(b) and 2.1(b)(xx), which clearly encompasses everything that is not an "Excluded Asset." Thus, APA § 2.2(f) cannot, in and of itself, render any cause of action into an "Excluded Asset" merely because the cause of action is "not related to a Purchased Asset." To do so, APA § 2.2(f) would have to be re-written to state that it applies to any cause of action "not related to <u>one of the specifically enumerated</u> Purchased Assets." Rather, the interplay of APA §§ 2.1(b) and 2.1(b)(xx), on the one hand, with § 2.2(f) would require that the causes of action and rights referred to in § 2.2(f) must relate to another category of "Excluded Asset" before they are to be excluded from the "Purchased Assets."

Given APA § 2.2(j), it would appear clear, however, that, unless there is a more specific provision of section 2.1(b) (which, as discussed above, there is not), the Debtor's causes of action and rights against third parties related to "all Excluded Locations," whether arising before or after the Closing, were intended to be "Excluded Assets."[6] In light of the broad definition of "related to," discussed above, and the

---

[6] APA § 2.2(a) lists "all cash or cash equivalents of Seller other than as contemplated by Section 2.1(b)(i) [which treats as a Purchased Asset "all cash and cash equivalents located at every Store and Warehouse Location, and amounts due pursuant to credit card and bank card purchases"]" as an "Excluded Asset," and at first blush, APA § 2.2(a) might seem to apply to the cash payments under the Class Action settlement.

12

effectively uncontroverted fact that the Class Action settlement relates to and is measured out in reference to point of sale transactions at the Debtor's various stores, the settlement proceeds at issue, therefore, would be "Excluded Assets" insofar as they relate to the "Excluded Locations." [7]

## Conclusion

For the foregoing reasons, Max Rave's motion is granted to the extent it seeks enforcement of the APA and turnover of the Class Action settlement proceeds calculated based on "Purchased Locations" and denied to the extent it seeks enforcement of the APA and turnover of the Class Action settlement proceeds calculated based on "Excluded Locations," based, in each case, upon the methodology employed by the Class Action Claims Administrator.

Counsel for Max Rave shall submit a proposed order consistent with this Memorandum of Decision.

---

However, that cash was paid to the Debtor's agent, Spectrum not until well after the closing of the APA. At the time of the closing under the APA, the asset at issue was still in the form of the Debtor's rights under the Class Action and the Class Action settlement. Applying APA § 2.2(a) not only to cash on hand at the time of the APA's closing but also to the post-closing cash proceeds of other assets, would negate provisions of APA § 2.1 (see APA §§ 2.1(b)(ii) and (iii), listing Accounts Receivable and Inventory as "Purchased Assets") and render other APA provisions superfluous (see APA § 2.2(e) and (i), listing Seller's insurance policies and rights thereunder that relate to any Excluded Asset, and tax refunds, credits and rebates, respectively, as "Excluded Assets"). Thus, APA § 2.2(a) should be read to apply only to cash or cash equivalents on hand at the time of the closing with the exception of cash and cash equivalents covered by APA § 2.1(b)(i).

[7] If the series in the opening phrase of APA § 2.1(b)(xi) were susceptible to being read in the disjunctive, the same result would also apply. There is no more specific "Purchased Asset" category that would trump APA §§ 2.2(f) and (j) with respect to the Class Action and its settlement, which pertains to events occurring several years before the date of the APA. The clause "relating to . . . the operation of the Business in respect of the Purchased Leases . . . whether arising out of events occurring prior to, on or after the Closing Date" in section 2.1(b)(xi) is broad enough, however, to encompass the Class Action and its settlement with respect to Purchased Lease store locations, in contrast with the temporally and functionally more narrow language used in the purchase agreements addressed by the two prior decisions by this Court upon which the Debtor and the Committee rely. See Homemaker Indus., 2004 U.S. Dist. LEXIS, at *16 (purchase agreement did not, as here, contain relevant language relating back to pre-closing period); In re TL Administration, 337 B.R. at 831-32 (purchase agreement defined the "Purchased Assets" only as those assets "used in the Business . . . as the same shall exist on the Closing Date," which would not extend, to a cause of action merely relating to the Business in respect of the Purchased Leases prior to the Closing Date, the relevant language in APA § 2.1(b)(xi)).

Dated: White Plains, New York
February 24, 2010

/s/Robert D. Drain
United States Bankruptcy Judge

14